JAMES M. HALLOWELL AND MARY M. HALLOWELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5278-69.   Filed June 22, 1971.

*Alexander L. Ross, Jr.*, for the petitioners.
*Stephen M. Miller*, for the respondent.

OPINION

RAUM, *Judge:* The Commissioner determined the following deficiencies in petitioners' income tax:

| Calendar year | Deficiency |
|---|---|
| 1964 | $1,696.00 |
| 1965 | 7,807.01 |
| 1966 | 1,144.80 |

---

The only question presented for decision is whether petitioner James M. Hallowell is to be charged with the gain derived from the sale of certain securities which he had "donated" to a family-controlled corporation shortly before the sales in issue were made. The facts have been stipulated.

Petitioners James M. and Mary M. Hallowell are husband and wife. They filed joint Federal income tax returns for the calendar years 1964, 1965, and 1966 with the district director of internal revenue at Boston, Mass., and resided in Chatham, Mass., at the time the petition in this case was filed.

Chatham Bowling Center, Inc. (Chatham), was incorporated under the laws of the Commonwealth of Massachusetts on March 29, 1954. Throughout the 3 calendar years involved herein, Chatham's officers and stockholders were as follows:

| Name | Title | Number of shares held | Percentage ownership |
|---|---|---|---|
| James M. Hallowell (petitioner) | Treasurer | 1 | .25 |
| Mary M. Hallowell (petitioner) | President | 204 | 51.00 |
| James M. Hallowell III (son of petitioners) | | 90 | 22.50 |
| Josselyn H. Bliss (daughter of petitioners) | | 90 | 22.50 |
| Dorothy M. Hallowell (sister of petitioner Mary M. Hallowell) | | 2 | .50 |
| Others | | 13 | 3.25 |
| Total | | 400 | 100.00 |

Chatham's Federal corporate income tax returns for 1964, 1965, and 1966 disclose that during this period petitioner James M. Hallowell (sometimes hereinafter referred to as James or Hallowell) was the only officer to receive compensation, that he devoted 100 percent of his time to the business of the corporation, and that he owned, directly or indirectly 96.25 percent of Chatham's stock. During the same period, Chatham's board of directors consisted of petitioners James M. and Mary M. Hallowell and Louise T. Hallowell, James' mother. On the death of Louise T. Hallowell in 1966, her place on the board of directors was taken by Josselyn H. Bliss, petitioners' daughter.

As of January 1, 1958, Chatham had net operating loss carryovers from prior years totaling $29,041. During its taxable years 1958 through 1963, its taxable income (loss), before taking net operating loss carryovers into account, was as follows:

| Taxable year | Taxable income (loss) |
|---|---|
| 1958 | ($6,089) |
| 1959 | (8,222) |
| 1960 | (8,724) |
| 1961 | (7,978) |
| 1962 | (2,825) |
| 1963 | 11,011 |

As of January 1, 1964, Chatham had available net operating loss carryovers of $22,903.

Prior to the years in question petitioners had "advanced" funds to Chatham and received in return non-interest-bearing "demand notes" as follows:

| Date | Amount |
|---|---|
| Mar. 11, 1957 | $29,000 |
| Dec. 21, 1957 | 12,000 |
| Dec. 23, 1958 | 11,000 |
| Dec. 30, 1959 | 13,000 |
| Dec. 30, 1960 | 13,000 |
| Total | 78,000 |

Commencing on December 24, 1963, and during the years here in issue, Hallowell transferred to Chatham 189¼ shares of International Business Machine Corp. (IBM) common stock which Chatham subsequently disposed of on the open market as follows:

| Date transferred to Chatham | Number of shares transferred | Basis to transferor | Date sold by Chatham | Net sale proceeds | Net capital gain |
|---|---|---|---|---|---|
| Dec. 24, 1963 | 5 | $569.93 | Mar. 16, 1964 (3 shares) | $1,704.10 | |
| | | | June 16, 1964 (2 shares) | 939.68 | $2,073.85 |
| Feb. 26, 1964 | 5 | 19.15 | June 16, 1964 | 2,361.69 | 2,342.54 |
| [1] | | [1] 154.80 | June 16, 1964 | 457.34 | 302.54 |
| [2] | | [2] zero | July 7, 1964 | 954.64 | 954.64 |
| June 5, 1964 | 6¼ | 625.48 | July 7, 1964 (3 shares) | 1,431.96 | |
| | | | Aug. 18, 1964 (3 shares) | 1,335.27 | |
| | | | Dec. 20, 1964 (¼ share) | 103.25 | 2,245.00 |
| July 7, 1964 | 10 | 1,107.46 | Aug. 18, 1964 (5 shares) | 2,225.44 | |
| | | | Sept. 8, 1964 (5 shares) | 2,190.39 | 3,308.37 |
| Aug. 10, 1964 | 10 | 1,135.66 | Sept. 8, 1964 (1 share) | 438.08 | |
| | | | Oct. 16, 1964 (9 shares) | 3,807.84 | 3,110.26 |
| Dec. 3, 1964 | [3] 5 | 493.80 | Dec. 21, 1964 (5 shares) | 2,055.35 | 1,561.55 |
| Total 1964 gain | | | | | 15,898.75 |
| Dec. 3, 1964 | 15 | 1,481.40 | Mar. 27, 1965 (10 shares) | 4,591.60 | |
| | | | Apr. 2, 1965 (5 shares) | 2,263.30 | 5,373.50 |
| Feb. 23, 1965 | 25 | 1,881.31 | Apr. 2, 1965 (5 shares) | 2,263.30 | |
| | | | May 10, 1965 (20 shares) | 9,603.20 | 9,985.19 |
| May 5, 1965 | 18 | 1,999.17 | May 26, 1965 | 8,570.88 | 6,571.71 |
| July 19, 1965 | 10 | 1,066.69 | July 20, 1965 | 4,728.45 | 3,661.76 |
| Aug. 23, 1965 | 40 | 4,532.18 | Aug. 27, 1965 | 19,628.11 | 15,095.93 |
| Nov. 8, 1965 | 20 | 2,458.39 | Nov. 16, 1965 (5 shares) | 2,665.34 | |
| | | | Nov. 24, 1965 (5 shares) | 2,735.59 | |
| | | | Dec. 28, 1965 (10 shares) | 4,980.95 | 7,923.49 |
| Total 1965 gain | | | | | 48,611.58 |
| Feb. 21, 1966 | 20 | 1,807.82 | Mar. 11, 1966 | 10,033.74 | 8,225.92 |
| Total gain from IBM sales in 1964, 1965, and 1966 | | | | | 72,736.25 |

[1] On Feb. 28, 1964, a fractional share of IBM was received from IBM for Chatham's account as a stock dividend, and $154.80 was paid to purchase a full share for Chatham's account. Chatham, therefore, had a basis of $154.80 for said share.

[2] On May 18, 1964, 2 IBM shares were received from IBM for Chatham's account as a stock dividend. On its books Chatham treated said shares as having a zero basis.

[3] On Dec. 3, 1964, 20 shares of IBM were transferred, but only 5 of said shares were sold by Chatham in 1964.

No additional shares of Chatham stock were issued to Hallowell upon his transfer of IBM stock to Chatham. The stock transfers were listed on Chatham's books as credits to a capital stock account and

debits to a securities and investments asset account, and were described in its journal entries as either donated capital or donated surplus. At the end of each of the years in issue, the net gain from the sales of the IBM stock was transferred on Chatham's books from donated capital or donated surplus to profit and loss.

All of the orders for IBM stock transfers to Chatham and orders for the subsequent sales thereof by Chatham were received and handled by George Draper of Draper Sears & Co., as broker. Each transaction and the records and accounts thereof were processed and maintained by E. F. Hutton & Co. Throughout the period in question, E. F. Hutton & Co. maintained two separate accounts, one in the name of Hallowell and one in the name of Chatham.

The manner in which the accounts were maintained is illustrated by the following example. The statement of Hallowell's account for the monthly period ending March 26, 1964, shows five IBM shares "Delivered" by James M. Hallowell as of March 4, 1964 (the settlement date for the transfer of February 26, 1964). The statement of Chatham's account shows the following entries:

1. 1 IBM share "Received" on February 28, 1964, and $154.80 paid for the "Fraction Bought";

2. 5 IBM shares "Received" on March 4, 1964 (settlement date for petitioner's delivery of 5 shares);

3. IBM dividend of $6.25 credited on March 10, 1964, and paid by check on March 23, 1964;

4. Sale of 3 IBM shares on March 13, 1964, for net sale proceeds of $1,704.10; and

5. Balance of 8 IBM shares still held by Chatham at end of monthly period.

The monthly statements from E. F. Hutton & Co. for the years in question reported IBM dividends credited and paid to Hallowell and Chatham as follows:

| James M. Hallowell | | Chatham | |
|---|---|---|---|
| June 12, 1964 | $7.50 | Mar. 10, 1964 | $6.25 |
| Sept. 10, 1964 | 12.50 | June 12, 1964 | 12.50 |
| Dec. 10, 1964 | 12.50 | Sept. 10, 1964 | 16.25 |
| | | Total | 35.00 |
| Total (1964) | 32.50 | Mar. 10, 1965 | 22.50 |
| Mar. 10, 1965 | 37.50 | June 10, 1965 | 27.00 |
| | | Dec. 10, 1965 | 30.00 |
| Total (1965) | 37.50 | | |
| Mar. 10, 1966 | 30.00 | Total | 79.50 |

The IBM stock transferred by Hallowell was not evidenced by stock certificates in his name, nor were any IBM stock certificates issued in the name of Chatham during the period in question. Rather all of the shares transferred by Hallowell and subsequently sold by Chatham were held in street name by E. F. Hutton & Co., as nominee

owner. Accordingly, neither Hallowell's nor Chatham's name appeared on IBM's corporate stockbooks as stockholders of record.

From time to time, on dates not disclosed by the record herein, Chatham made payments to or for the benefit of petitioners. Such payments were recorded on Chatham's books in an asset account entitled "Open account—James M. Hallowell and Mary M. Hallowell, jointly." As of January 1, 1964, that account reflected a debit balance of $679.98 (i.e., owed by petitioners to Chatham).

During 1964 Chatham paid a total of $12,627.30 to or for the benefit of petitioners, and petitioners reimbursed Chatham in the total amount of $875. In addition, on December 18, 1964, the note held by petitioners dated December 30, 1960, in the amount of $13,000 was credited to the open account as having been paid in full. As the result of the foregoing transaction, on January 1, 1965, the open account reflected a credit balance of $567.72 (i.e., an amount owed by Chatham to petitioners).

During 1965 Chatham paid a total of $57,525.34 to or for the benefit of petitioners, and petitioners reimbursed Chatham in the total amount of $2,959.45. On December 27, 1965, the notes held by petitioners, dated March 11, 1957, December 21, 1957,[1] and December 30, 1959, in the respective amounts of $29,000, $12,000, and $13,000 were credited to the open account as having been paid in full. Consequently, as of January 1, 1966, there was a credit balance in the open account of $1.83.

During 1966 Chatham paid $11,567.57 to or for the benefit of petitioners. During the same year, petitioners reimbursed Chatham in the total amount of $9,079 and had salary totaling $5,111.16 credited to the open account. As a result, on December 31, 1966, there was a credit balance in the open account of $2,624.42. As of December 31, 1966, the note held by petitioners dated December 23, 1958, in the amount of $11,000 remained outstanding.

The following table summarizes the foregoing transactions:

|  | 1964 | 1965 | 1966 | Total |
| --- | --- | --- | --- | --- |
| Opening balance in "open account" | $679.98 | ($567.72) | ($1.83) |  |
| Gross proceeds from IBM stock sales | 20,005.03 | 62,030.72 | 10,083.74 | $92,069.49 |
| Gain from IBM stock sales | 15,898.75 | 48,611.58 | 8,225.92 | 72,736.25 |
| Distributions for benefit of petitioners | 12,627.30 | 57,525.34 | 11,567.57 | 81,720.21 |
| Payments by petitioners to Chatham | 875.00 | 2,959.45 | 9,079.00 | 12,913.45 |
| Net payments to petitioners | 11,752.30 | 54,565.89 | 2,488.57 | 68,806.76 |
| Notes credited to "open account" | 13,000.00 | 54,000.00 |  | 67,000.00 |
| Closing balance in "open account" | (567.72) | (1.83) | [1] (2,624.42) |  |

[1] This figure reflects $5,111.16 in unpaid salary credited to the open account during 1966.

On its Federal corporate income tax returns for 1964, 1965, and 1966, Chatham reported long-term capital gains stemming from the

---

[1] The stipulation of facts filed by the parties inconsistently describes the $12,000 note as dated both Mar. 21, 1957, and Dec. 21, 1957. The discrepancy is unexplained.

sales of the IBM stock in the amounts of $15,898.75, $48,611.58, and $8,225.92, respectively. Such gains were computed by subtracting from the sales proceeds the basis of the stock in the hands of Hallowell. Chatham's returns for the 3 years in issue disclosed taxable income (loss) before taking net operating loss carryovers and "special deductions" into account as follows:

| Calendar year | Taxable income (loss) |
|---|---|
| 1964 | $5,731.88 |
| 1965 | 33,060.38 |
| 1966 | (5,176.83) |

On its 1964 and 1965 returns, Chatham deducted net operating loss carryovers in the respective amounts of $22,903.13 and $17,215.58. On the basis of the foregoing loss carryover deductions, together with comparatively minor "special deductions" [2] Chatham reported a loss of $17,215.58 in 1964 and taxable income of $15,777.22 in 1965.

Petitioners did not report any of the gains stemming from the sales of the IBM stock on their joint Federal income tax returns for 1964, 1965, and 1966. In his statutory notice of deficiency, the Commissioner determined that petitioners realized long-term capital gains of $15,898.75, $48,611.58, and $8,225.92 from the sales of the IBM stock during 1964, 1965, and 1966, respectively.

The dispute between the parties in this case concerns solely the question of *who* is to be charged with the gain realized on the sales of the IBM stock. There is no dispute with regard to the question of whether or when gain was realized, with regard to the amount of such gain, or with regard to its character as long-term capital gain. The consequence of charging the gain to Chatham rather than to petitioner would be the following: As the result of Chatham's substantial net operating loss carryovers, much of the gains derived from the sales would not increase its total income tax liability during the years in issue. Moreover, as the result of Chatham's substantial outstanding indebtedness to petitioners, its distributions to them or for their benefit would be treated by them as a nontaxable return of capital. Consequently, although the sales would result in the realization of substantial gains, they would produce only a small increment in the income tax liabilities of Chatham and petitioners.

Petitioners contend that at various times between December 24, 1963, and February 21, 1966, inclusive, petitioner James M. Hallowell transferred IBM stock to Chatham as contributions to capital, that thereafter such stock was an asset of the corporation, and that con-

---

[2] The "special deductions" were wholly attributable to the 85-percent deduction from intercorporate dividends, most of which were paid by IBM with respect to the stock now in question.

sequently the gain derived from Chatham's subsequent sales of the stock is chargeable only to Chatham. The Commissioner's position is that although in form Chatham was the seller of the IBM stock, in substance it was Hallowell who sold the stock and that therefore he must be charged with the gain realized on such sales. In support of his position the Commissioner places particular emphasis upon the fact that during 1964 through 1966, while the IBM stock was being sold, Chatham made substantial distributions to or for the benefit of petitioners in the aggregate amount of $68,806.76.

The Commissioner relies on an extensive body of case law holding that in certain circumstances a transfer of appreciated property followed by a sale of such property by the transferee will be treated for tax purposes as a sale by the transferor and that accordingly the gain realized on the sale must be charged to the transferor. In such cases the transferee has commonly been referred to as a "conduit" through which the transferor has passed title to the property sold. See, e.g., *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *Griffiths* v. *Commissioner*, 308 U.S. 355; *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609; *United States* v. *Lynch*, 192 F. 2d 718 (C.A. 9), certiorari denied 343 U.S. 934; *Waltham Netoco Theatres, Inc.* v. *Commissioner*, 401 F. 2d 333 (C.A. 1), affirming 49 T.C. 399; *Palmer* v. *Commissioner*, 354 F. 2d 974 (C.A. 1), affirming per curiam 44 T.C. 92; *Abbott* v. *Commissioner*, 342 F. 2d 997 (C.A. 5), affirming per curiam a Memorandum Opinion of this Court; *Harry C. Usher, Sr.*, 45 T.C. 205; *Arnold Malkan*, 54 T.C. 1305. Many of these cases involve a corporate distribution of property to the corporation's shareholders, followed by a sale of such property formally carried out by the shareholders. See, e.g., *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *Waltham Netoco Theatres, Inc.* v. *Commissioner, supra*, 401 F. 2d 333 (C.A. 1); *United States* v. *Lynch*, 192 F. 2d 718 (C.A. 9). In others, the roles of corporation and shareholder have been reversed; the shareholders' transfer of property to the corporation is followed by a sale of property formally carried out at the corporate level. See, e.g., *Griffiths* v. *Commissioner*, 308 U.S. 355; *Palmer* v. *Commissioner*, 354 F. 2d 974 (C.A. 1); *Abbott* v. *Commissioner*, 342 F. 2d 997 (C.A. 5). But both groups of cases rest on the same fundamental principle, that "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334.

Petitioners contend that *Court Holding Co.* and its progeny are inapplicable to the facts before us. They rely on a related group of cases which have held that in certain circumstances a transfer of appreciated property followed by a sale of such property by the trans-

feree will be treated as it purports to be: a sale by the transferee and not by the transferor. See, e.g., *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451; *Sheppard* v. *United States*, 361 F. 2d 972 (Ct. Cl.); *Martin* v. *Machiz*, 251 F. Supp. 381 (D. Md.).

The distinction between the two lines of cases is often shadowy, particularly in the context of a purported transfer between a closely held corporation and one or more of its shareholders. Cf. *United States* v. *Cumberland Public Service Co.*, 338 U.S. at 454–455. But "it is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." *Id.* at 456. Our task is to determine who in substance, and not simply in form, made the sale. See *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334; *Arnold Malkan*, 54 T.C. 1305, 1313.

The essentials of this case are quite simple. Hallowell and his immediate family owned over 96 percent of Chatham's outstanding stock; he and his wife alone held 51.25 percent of its stock. Hallowell was Chatham's only compensated officer. At various times between December 24, 1963, and February 21, 1966, he "transferred" a total of 189¼ shares of appreciated IBM securities from his account with E. F. Hutton & Co. to Chatham's account with the same firm. Shortly after each of such "transfers," all of the shares were sold on the open market. The interval between the time of the "transfer" of the shares and the time of their sale varied from as brief as 1 day to as long as 6½ months. The average interval was less than 1½ months. The gross proceeds derived from the sales amounted to $92,069.49, resulting in an aggregate net gain of $72,736.25. While the sales were being made, Chatham made gross distributions to or for the benefit of petitioners in the amount of $81,720.21. As the table at page 604 *supra* discloses, the amount of such annual distributions fluctuated roughly in line with the amount of gain derived annually from the sales of the IBM stock.[3]

On the basis of the record before us we conclude that the sales of the IBM stock were made by Hallowell and that Chatham served only as a conduit to that end. Hallowell must therefore be charged with the gain derived from such sales. Cf. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *Griffiths* v. *Commissioner*, 308 U.S. 355; *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609; *Palmer* v. *Commissioner*, 354 F. 2d

---

[3] Apart from bookkeeping entries, the purported transfers of the IBM stock had little effect upon the shares themselves. Since the shares "transferred" were held in street name by E. F. Hutton & Co., and since both Hallowell and Chatham maintained accounts with that firm, neither Hallowell nor Chatham appeared on IBM's books as stockholders of record; no IBM certificates were issued in the name of either party; and Chatham's purported sales of the IBM shares were processed by the same firm that would have handled them if it had been Hallowell who made the sales. Cf *United States* v. *Lynch*, 192 F. 2d at 719–720 (C.A. 9); *Commissioner* v. *First Bank of Stratford*, 168 F. 2d 1004, 1005 (C.A. 5), certiorari denied 335 U.S. 867; *United States* v. *General Geophysical Co.*, 296 F. 2d 86, 89 (C.A. 5).

974 (C.A. 1) ; *Waltham Netoco Theatres, Inc.*, 401 F. 2d 333 (C.A. 1) ; *United States* v. *Lynch*, 192 F. 2d 718 (C.A. 9) ; *Abbott* v. *Commissioner*, 342 F. 2d 997 (C.A. 5) ; *Salvatore* v. *Commissioner*, 434 F. 2d 600 (C.A. 2), affirming a Memorandum Opinion of this Court; *Arnold Malkan*, 54 T.C. 1305; *Harry C. Usher, Sr.*, 45 T.C. 205.

Petitioners urge that the foregoing cases do not support the Commissioner's position here on the ground that at the time of the stock "transfers" there was no prior contract or prearranged plan for the subsequent sales of the IBM securities. First, we note that this case was fully stipulated and that no stipulation was made with regard to the presence or absence of such a plan. The burden of proof is on the petitioners, and the fact that the stipulation leaves this matter unclear can hardly operate in their favor. To the extent that the existence *vel non* of a plan is critical the matter must be disposed of against petitioners for failure of proof. Secondly, the Supreme Court's opinion in *Commissioner* v. *Court Holding Co., supra*, 324 U.S. at 334, makes it quite clear that the absence of a prior written agreement is not decisive in cases like that now before us:

It is urged that respondent corporation never executed a written agreement, and that an oral agreement to sell land cannot be enforced * * *. But the fact that respondent corporation itself never executed a written contract is unimportant, since the Tax Court found from the facts of the entire transaction that the executed sale was in substance the sale of the corporation.

Cf. *Arnold Malkan*, 54 T.C. at 1313; *S. Nicholas Jacobs*, 21 T.C. 165, 169, affirmed 224 F. 2d 412 (C.A. 9). Moreover, in the context of this case, whether an oral arrangement for the sales had been made at the time of the "transfers" of stock to Chatham is of relatively minor importance. The shares of IBM were publicly traded and were obviously readily marketable; prior arrangements in such circumstances would therefore have been a superfluity. Cf. *United States* v. *Lynch*, 192 F. 2d at 720–721. Finally, the persistent pattern, extending for over a 2-year period, of transfers of stock to Chatham, followed by Chatham's sales of such stock and by substantial distributions to or for the benefit of petitioners,[4] strongly suggests to us that the transactions in question were preconceived.

---

[4] Petitioners assert that there was no correlation between the timing and amounts of the distributions and the timing and amounts of the stock sales. Our findings reveal, however, that there was a general correlation between the annual amount of the distributions and the sales proceeds realized each year. While the record does not reveal the precise timing of the distributions, the absence of such information must weight against petitioners in view of their burden of proof. In any event, as we stated in *Arnold Malkan*, 54 T.C. at 1313:

"We do not limit our inquiry to a determination of whether creation of the trust preceded the execution of a binding contract with the underwriters. 'Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant.' *Commissioner* v. *Court Holding Co., supra* at 334. Our examination must focus on the realities of the transaction rather than the refinements of legal title, the verbiage of written instruments, or the chronological order of formal events."

Indeed, in one highly significant respect, the facts of this case are more favorable to the Commissioner's position than are those in many of the cases upon which he relies. While Chatham was selling the transferred property, it was also making substantial parallel distributions to or for the benefit of petitioners. The conclusion is virtually inescapable that the sales were made for the benefit of Hallowell and his wife. The receipt of such benefits argues strongly for attributing the gains on the sales to Hallowell.[5] See *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613. To be sure, Chatham retained some of the proceeds. But it is clear to us on this record that since Chatham was in need of funds, Hallowell used this device for making a contribution to the corporation equal to the difference between the proceeds of the IBM sales and the distributions to himself and his wife. Cf. *Simon* v. *Commissioner*, 285 F. 2d 422, 425 (C.A. 3).

Petitioners also urge that the Commissioner's position ignores the reality of each of the stock "transfers," as well as the status of Chatham as a distinct corporate entity. We disagree. In upholding the Commissioner's position we conclude not that any particular aspect of the series of transactions in issue is unreal or a "sham," but rather that the transactions must be viewed as a whole and that when so considered, the transactions in substance amount to sales of the IBM stock by Hallowell. As the Supreme Court stated in *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, 334:

The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole * * *

Cf. *Minnesota Tea Co.* v. *Helvering*, 302 U.S. 609, 613.

Moreover, we are quite skeptical of petitioners' characterization of the facts of this case. In particular, characterizing Hallowell's "transfer" of stock worth approximately $92,000 as a stockholder contribution to capital seems to us unlikely (at least in the absence of additional explanation) in light of the fact that Hallowell himself held only one share of Chatham's stock and in light of the amount of Chatham's outstanding indebtedness, as well as its history of operating losses.

---

[5] Petitioners urge that Chatham's distribution served a valid corporate purpose: reduction of its outstanding indebtedness. However, the concept of "corporate purpose" may not be particularly meaningful in the context of a family-controlled corporation like Chatham. Cf. *Bradbury* v. *Commissioner*, 298 F. 2d 111, 118 (C.A. 1), affirming a Memorandum Opinion of this Court. In any event, the fact remains that the distributions were made for the benefit of petitioners. The presence of such benefits is of overriding significance, regardless of the validity of any alleged corporate purpose, for purposes of deciding whether petitioners ought to be charged with the gain realized on the sale of the IBM stock.

Nor is it a matter of consequence, as urged by petitioners, that the distributions to petitioners were matched at year end in 1964 and 1965 by cancellation of Chatham's obligations on notes to petitioners in roughly the same amounts as the distributions. Chatham was in dire financial straits, and payment of obligations to those who controlled its affairs in such circumstances can hardly be viewed as anything more than distributions for their benefit.

We are also unpersuaded by the cases relied upon by petitioners. We note in particular that Hallowell transferred appreciated securities to a corporation controlled by his immediate family and that while selling the securities, the corporation made substantial and purportedly untaxed distributions to or for the benefit of Hallowell and his wife. These facts alone serve to distinguish such cases as *W. B. Rushing*, 52 T.C. 888, 891–893, 896–898, affirmed 441 F. 2d 593 (C.A. 5, 1971), and *Jacobs* v. *United States*, 280 F. Supp. 437 (S.D. Ohio), affirmed 390 F. 2d 877 (C.A. 6). Moreover, *W. B. Rushing*, *supra*, and *Grand Rapids Trust Co.*, 34 B.T.A. 170, also cited by petitioners, involved only the question of *when* a transferor of appreciated property would be taxed, and not *whether* he would be taxed at all.[6] Furthermore, *Grand Rapids Trust Co.*, *supra*, must be read in the light of the fact that it was decided in 1936, 9 years before the Supreme Court's decision in *Commissioner* v. *Court Holding Co.*, 324 U.S. 331.[7]

*Decision will be entered for the respondent.*

---

[6] See, e.g., *Rushing* v. *Commissioner*, 441 F. 2d 593, 597 (C.A. 5, 1971) ; "this is not a case where one taxpayer has attempted to shift the gain to a second taxable entity in order to reap the benefits of the second entity's lower tax rate."

[7] *Grand Rapids* must also be read in the light of *Griffiths* v. *Commissioner*, 308 U.S. 355, which disapproved this Court's prior decision in 37 B.T.A. 314, and in the light of this Court's subsequent treatment of somewhat similar situations in *Belle G. Loewenberg*, 39 B.T.A. 844, and *G. M. Jackson*, 39 B.T.A. 937.