ELEANORE H. SMALLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent H. EARL SMALLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smalley v. Commissioner
Docket Nos. 4638-68, 4641-68.
United States Tax Court
T.C. Memo 1973-85; 1973 Tax Ct. Memo LEXIS 206; 32 T.C.M. (CCH) 373; T.C.M. (RIA) 73085; April 10, 1973, Filed Wm. Royall Middelthon, Jr. and Woodrow M. Melvin, Jr., for the petitioners. W. Reeder Glass, for the respondent. TIETJENS
MEMORANDUM FINDINGS OF FACT AND OPINION TIETJENS, Judge: In these consolidated cases the Commissioner determined deficiencies in the joint income tax liability of petitioners H. Earl Smalley, Jr., and Eleanore H. Smalley in the amount of $71,457.59 for 1960 and $2,048.14 for 1961, and issued separate statutory notices. *207 Petitioners conceded the 1961 deficiency. We are asked to determine: 2 (1) The amounts of the net operating losses of two subchapter S corporations wholly-owned by H. Earl Smalley, Jr., that petitioners may deduct in 1960 under section 1374(c) (2), Internal Revenue Code of 1954, [1] and whether petitioners may carry over to later years any part of any net operating loss which we may determine to be nondeductible in 1960. Depending on our resolution of the foregoing, we are asked to determine whether the Commissioner properly decreased the net operating loss of Aerologics, Inc. to $70,331.67; and (2) whether H. Earl Smalley, Jr., realized a long-term capital gain of $124,353.26 upon the sale of 3,300 shares of Hertz Corporation stock or whether the gain was realized by a family corporation of which he was a 50 percent owner. FINDINGS OF FACT Eleanore H. Smalley and H. Earl Smalley, Jr., husband and wife, resided in Miami, Florida at the time of filing their petitions and amended petitions with this Court. Eleanor H. Smalley is a party herein only *208 by virtue of having filed with her husband joint individual Federal 3 income tax returns for the years in issue, and an amended return for 1960, which returns were filed with the district director of internal revenue at Jacksonville, Florida. Further reference to petitioner means H. Earl Smalley, Jr., only. Petitioner was the controlling shareholder of numerous closely held corporations. The oldest of them, Smalley Corporation was incorporated in Florida in 1957; petitioner held 5,000 shares of the authorized capital stock, his wife held 4,999 shares, and 1 share was held by William E. Jones. Smalley Corporation had a subsidiary, Smalleylogics Corporation, which was incorporated August 18, 1959 and on that date to which was transferred operating assets of Smalley Corporation, having a net asset value of $194,880.80, solely in exchange for its capital stock. The property transferred consisted of a 39-acre tract of real property known as the Aero Country Club (formerly Brown's Airport) located on U.S. Highway 1 in Dade County and another tract, LeJeune Terminals, lots 5-14. LeJeune Terminals today operates Miami International Airport. The Aerologics Corporation was incorporated *209 in Florida by petitioner in August 1959. Petitioner took all of its 4 capital stock for $5,000. Aerologics rented the use of the airport facilities on the Aero Country Club parcel from Samalleylogics. Stevens Skyways, Inc., was incorporated in Florida in September 1960 by petitioner and John T. Stevens. Each subscribed to half of its total 5,000 shares of capital stock for a price of $250. On January 31, 1962, petitioner acquired the stock of John T. Stevens and thereafter was the only shareholder. The sole activity of Stevens was operating an airport and flying school. Both Aerologics and Stevens elected to be taxed as a small business corporation under the provisions of subchapter S and filed corporate income tax return Forms 1120-S beginning with taxable years ending with or within 1960. The corporations mentioned above adopted fiscal years as follows: Corporation
Fiscal Year Ending Smailey Corporation
July 31
Smalleylogics Corporation
September 30
Aerologics Corporation
November 30
Stevens Skyways, Inc.
December 31
In November 1959, Smalley Corporation transferred planes, buildings and equipment at book value to Aerologics Corporation. *210 In October 1960, Aerologics sold these assets to 5 Stevens Skyways, Inc. (hereinafter sometimes called Stevens). The sale was recorded on Aerologics' books as follows: Accounts receivable and inventory
$ 32,061.78
Fixed assets
106,436.04
Other
19,321.29
Notes payable
$142,646.18
Accumulated depreciation
16,278.33
Deferred income
14,005.98
Gain
15,111.38
$172,930.49
$172,930.49
In part payment for the assets transferred, Stevens gave a note to Aerologics in the principal amount of $35,945.54 on November 1, 1960. The note was filed for record in the Dade County Public Records on January 5, 1961. It was later reduced by $6,325.82 to $29,619.72 because some of the accounts receivable transferred in the sale were determined to be worthless.
The note from Stevens to Aerologics was transferred by the latter to petitioner; this transfer was recorded on the Aerologics books on April 30, 1961 as follows: Smalley, Jr. - personal
260
29,619.74
Investment
131
29,619.72
Note Skyways Inc. transferred from Aerologics to Mr. Smalley's personal account - This occurred on Feb. 28, 1961 on Stevens Skyways books. *211 6 In 1960 Stevens suffered a net operating loss of $6,289.73. In the statutory notice of deficiency, the Commissioner determined that petitioner was entitled to deduct only $250 of the one-half share of the net operating loss of Stevens claimed by petitioner in 1960; the claimed loss was $3,144.87, but the adjusted basis of petitioner's capital stock in Stevens (determined without regard to section 1376) was $250. The entire amount of the difference, $2,894.87, is in dispute. Stevens Skyways, Inc., discontinued operation of the airport in 1962 and transferred it back to Aerologics. The equipment originally transferred to Stevens was encumbered by a chattel mortgage held by Merchants Bank. The chattel mortgage was not notarized until December 20, 1960; it was initially filed for record on December 28, and re-recorded on January 5, 1961 when certain additional schedules of security were added. Aerologics Corporation recorded on its books as loans from stockholders during its taxable year ending November 30, 1960 a total of $69,565.12. This figure was composed of net advances by petitioner of $44,590.12 plus a credit to petitioner's loan account of $24,975. The latter amount *212 was based on $25,000 note given to Merchants Bank of Miami by 7 Aerologics in November 1960, as reflected in an entry on the corporate books of February 28, 1961, which petitioner guaranteed. The note to Merchants Bank was not repaid either by Aerologics or by petitioner during 1960, nor did petitioner advance any moneys to Aerologics during 1960 other than the amount previously mentioned. Petitioner pledged 5,000 shares of Hertz Corporation stock to secure the loan from Merchants Bank. Aerologics suffered a net operating loss for its taxable year ending November 30, 1960. The corporation reported a loss of $73,797.22 on its income tax return. In the statutory notice the Commissioner disallowed $3,465.55 of a claimed bad debt deduction of $9,791.37. The Commissioner allowed the difference which was based on certain accounts receivable transferred along with the Brown airport facility by Stevens Skyways, Inc., in October 1960 becoming worthless sometime after November 1, 1960. Aerologics incurred the loss by reducing the indebtedness of Stevens to Aerologics by $6,325.82. Based on the foregoing, the Commissioner determined that the net operating loss of Aerologics was *213 $70,331.67. However, he further contends that the credit to petitioner's loan account 8 in the amount of $24,975 on Aerologics' books cannot be considered part of petitioner's basis of the indebtedness of Aerologics to petitioner for 1960 under section 1374(c) (2) (B). Petitioner often pledged Hertz stock to secure loans to corporations that he controlled. He had pledged over 11,000 shares of Hertz as collateral for loans by the First National Bank of Miami to Smalley Corporation. During and prior to 1960, petitioner was a paid consultant to Hertz Corporation. This position grew out of petitioner's involvement in owning and operating a rent-a-car business which was known as Couture National Rent-a-Car Corporation and which ultimately merged with the Hertz Corporation. Petitioner and members of his family received lettered Hertz stock as a result of the tax-free reorganization through which the merger was accomplished. As of January 14, 1960, Smalley Corporation owed the First National Bank of Miami $268,036.87. Its chief assets at that time consisted of securities held for investment worth in the aggregate approximately $40,000, a receivable from the sale of a boat *214 valued at $15,000 and the stock of 9 its subsidiary, Smalleylogics. The assets of the subsidiary were appraised in the late 1959s at $850,000; they were mortgaged to the extent of $300,000. On the corporate income tax return for the taxable year ending July 31, 1960, Smalley Corporation reported on Schedule L a deficit at the close of the fiscal year of $23,108.95. Sometime before July 1959, petitioner was appraised by his investment bankers, Hayden, Stone & Company, of the possibility of a combination of Smalley Corporation and the Moxie Co. of Boston, Massachusetts, a bottler of soft drinks. Thereafter petitioner began negotiations with Maurice H. Kamm, the controlling shareholder of Moxie. Their correspondence proved so fruitful that they soon prepared a written memorandum of a proposal whereby petitioner would exchange real estate held by Smalleylogics for 590,000 shares of common stock of Moxie. In that connection petitioner had the Aero Country Club and LeJeune Terminals properties valued by an independent appraiser. On November 3, 1959, Kamm wrote to petitioner that the negotiations were "all for nought," due to the opposition of minority shareholders of Moxie. *215 However, in January and February of 1960 negotiations along the lines of the original memorandum resumed. 10 Kamm warned petitioner in late 1959 that the level of Smalley Corporation's long-term liabilities would be an obstacle to Kamm's obtaining approval of the Moxie directors for the Smalley-Moxie acquisition. He urged petitioner to reduce the indebtedness in order to "clean up the Smalley balance sheet." At this time, Robert McDaniel, a vice-president of First National Bank of Miami, also expressed concern about the level of Smalley corporation's indebtedness to his bank. McDaniel strongly urged petitioner to retire some of the loans, although he made no threats to call any of the loans. Beginning in December 1959, petitioner sought permission from First National to sell some of the hypothecated Hertz stock to reduce the Smalley Corporation debt. Both petitioner and Smalley Corporation maintained custodian accounts at the bank. In a letter dated December 4,1959, petitioner directed the trust department of the bank to transfer, among other things, 300 shares of Hertz from his personal custodian account to that of Smalley Corporation and advised it that the transfer *216 was to be "merely a contribution of capital to the Smalley Corporation." The transfer 11 was accomplished on January 12, 1960. The next day petitioner issued instructions for the transfer of 3,000 shares; in this case, the securities were to be delivered to Hayden, Stone & Company, for sale at $40 per share, and the instructions were to credit the proceeds to the principal of petitioner's custodian account and thereupon to transfer $68,500 immediately to the Commercial Loan Department of the bank. On January 20, 1960, the 3,000 shares were sold and of the net proceeds of $118,658.10, $80,000 was applied to five commercial loan accounts and over $38,000 was applied to the checking and custodian accounts of Smalley Corporation. In September 1960 Smalley Corporation sold the 300 shares transferred to it on January 12, and the proceeds of $15,224 were transferred to petitioner in 1960 and treated on the corporate books as repayment in part of loans made by petitioner to the corporation. On April 20, 1960, a date falling after the sale of the 3,000 shares but before the sale of the remaining 300, petitioner directly sold 3,000 pledged shares of Hertz stock. Of the proceeds of *217 $157,733.86, petitioner applied $23,667.59 to the payment of the principal and interest of personal loans 12 made to petitioner by First National Bank, and $134,066.27 was applied to the payment of the principal and interest of five loans made to Smalley Corporation by the bank. On June 8, 1960 petitioner sold an additional 1,000 shares of Hertz for $56,000. Petitioner employed Richard E. Warren, a public bookkeeper, to supervise the books and records of petitioner's corporations. Warren became the custodian of the books in April 1961. He and his predecessors adapted their bookkeeping procedures to a computerized accounting service sold by the Service Bureau Corporation. Early in 1960 petitioner engaged the C.P.A. firm of Ring, Mahoney & Arner to segregate the intermingled records of several of petitioner's corporations and to set up separate books where necessary. By the end of March 1960 the firm had prepared 60 adjusting journal entries for input to the computer system. In that compilation, the transfers on January 12 and 14, 1960 of 3,300 shares of Hertz stock were recorded variously on the books of Smalley Corporation as follows: 13 Journal Entry 29
Debit
Credit Gain or loss on sale of assets
$ 1,341.90
Investment Expense
120.11
H. Earl Smalley - personal
118,421.28
First National Bank - Custodian account
142.28
Dividend Income
26.25
Investment - Hertz stock
120,000.00
$120,026.25*
$120,026.25
*218 To record sale of Hertz stock and transactions in Custodian Account from August 1, 1959 to March 31, 1960. Journal Entry 50
Investments - 3,300 shares Hertz Corp.
9,529.08
Paid in surplus
9,529.08
To record contribution of 3,300 shares of Hertz Corp. stock by H. Earl Smalley, Jr. Transfer at tax basis to H. Earl Smalley, Jr. of $2.8876 per share. Transferred 1-14-60.
Journal Entry 51
Investments - 3,000 shares Hertz stock
120,000.00
Gain on sale of assets
111,337.20
Investments - 3,000 shares Hertz stock
8,662.80
To correct J.E. #29 recording sale of 3,000 shares of Hertz stock
Sale price at $40 per share
$120,000.00
Expense of sale
(1,341.90)
Cost of stock
(8,662.80)
Net Gain on Sale
$109,995.30 14 Journal entry 51 corrected journal entry 29. The account styled "H. Earl Smalley - personal" listed in entry 29 was a liability account used to reflect advances to Smalley Corporation by petitioner. In one journal entry 28, which preceded the foregoing entries, the transfer of the 3,000 shares from petitioner's personal custodian account was treated as a purchase of stock of Smalley Corporation *219 by petitioner, as follows: Journal Entry 28
Debit
Credit Investment
$120,000
Capital Stock and paid in surplus (breakdown not available)
$120,000
Journal entry 50 superseded journal entry 28. Journal entries 50 and 51 were made a result of conversations between a staff member of Ring, Mahoney & Arner and petitioner. In the statutory notice the Commissioner determined that in 1960 petitioner realized but did not report long-term capital gain of $124,353.26 from the sale of the 3,300 shares of Hertz stock. At that time the Commissioner relied on section 482. [2] The entire amount of the gain is in issue. 15 Due to the application of net operating losses carried over from its first 2 full fiscal years, 1958 and 1959, Smalley Corporation had no tax liability for its 1960 and 1961 fiscal years. The taxable income and losses of the corporation are as follows: Fiscal Year Ending July 31
Taxable Income before NOL deduction
Taxable Income after NOL deduction
Unexpired NOL carryover 1958
($21,796.96)
-
$21,796.96
1959
( 69,123.58)
-
90,920.14
1960
79,475.82
11,709.52
1961
7,379.27
0
4,330.25
*220 OPINION We turn first to the issues pertaining to petitioner's deduction of the net operating losses of two of his wholly-owned subchapter S corporations, Stevens Skyways, Inc. and Aerologics, Inc. Under section 1374(c) (2), a shareholder's portion of the corporate net operating loss is limited to the adjusted basis of his stock and of any indebtedness of the corporation to the shareholder determined as of the close of the corporation's taxable year. If a shareholder's pro rata share of the corporation's net operating loss exceeds the limitation, the excess is not allowable as a deduction for any taxable year. Section 1.1374-1(b) (4) (i) (b ), Income 16 Tax Regs.; Richard Lee Plowden, 48 T.C. 666, affd. 398 F.2d 340 (C.A. 4, 1968), certiorari denied. Accordingly, petitioner's suggestion that he may carry over any loss that he may be unable to deduct in 1960 is without merit. In view of the foregoing, the only question with regard to the deduction of the loss of Stevens Skyways, Inc. is the factual one of whether petitioner's 1960 basis in that corporation includes the value of a note of Stevens to Aerologics, Inc. that was subsequently assigned *221 by Aerologics to petitioner. The basis of petitioner's stock in Stevens was $250. He seeks to deduct one-half of the loss for 1960, $3,144.87. The Commissioner contends that the assignment of the Stevens note occurred after December 31, 1960, the close of that corporation's taxable year. We agree with him that a fair interpretation of the evidence is that the note was not transferred to petitioner in 1960. A journal entry included in the parties' stipulation indicates that the transfer was entered on Aerologics' books on April 30, 1961 and on Stevens' books on February 28, 1961. We also know that the note and the chattel mortgage accompanying the note in the Stevens-Aerologics transaction were not executed by 17 Stevens until November 1, 1960, and the latter was not notarized until December 20, 1960. A third journal entry on the Stevens books is dated January 1, 1961 - one day too late. With regard to the Aerologics loss, it is undisputed that petitioner's basis in that corporation was at least $49,590.12. Petitioner contends that his basis included an additional $24,975, which was the amount of a credit to petitioner's loan account on the Aerologics books representing *222 a note given to Merchants Bank by Aerlogics and guaranteed by petitioner. We cannot agree. It is stipulated that the note was not repaid during 1960. Numerous decisions of this Court declare that an outstanding indebtedness on which a taxpayer is merely the guarantor cannot be taken into account for purposes of section 1374(c) (2) (B) in determing his portion of the corporation's net operating loss. William H. Perry, 47 T.C. 159 (1966), affd. 392 F.2d 458 (C.A. 8, 1968); Milton T. Raynor, 50 T.C. 762 (1968); Joe E. Borg, 50 T.C. 257 (1968). We need not reach the issue whether the Commissioner properly determined that the loss sustained in 1960 by Aerologics was $70,331.67 instead of $73,797.22 as petitioner claims, since the allowable deduction will be less than either of those amounts. 18 The remaining issue is whether petitioner's 1960 income included long-term capital gain of $124,353.26 realized from the sale of 3,300 shares of Hertz Corporation common stock. Petitioner contends that the gain is that of Smalley Corporation, on the ground that petitioner had contributed the stock to the capital of that corporation *223 prior to the sale. The Commissioner counters that in substance the sale was made by petitioner individually, under a number of theories. As stated above, the Commissioner does not rely on section 482. He first argues that the transfer of 3,000 of the Hertz shares was intended to be and was in fact a sale by petitioner individually. [3] The fact that in Journal Entry 29 the account styled "Investment" was credited at the market value of the stock rather than at petitioner's tax basis is cited in support of this contention. However, there was credible testimony about one Journal Entry 28 in which a transaction was recorded as a purchase of Smalley Corporation stock by petitioner. Journal Entry 51 corrected all prior entries to reflect a contribution to capital. These accounting efforts, personally supervised by petitioner, indicate to 19 us that petitioner was sophisticated enough to anticipate the unfavorable tax consequences that an outright sale of the Hertz stock would entail. They may be contrasted with the clearly taxable dispositions of large blocks of Hertz on other occasions, such as petitioner's sale of 1,000 shares on June 8, 1960. We think and hold on the basis *224 of the record herein petitioner intended to make a contribution of all 3,300 shares to Smalley Corporation and did so. Although the transfer of the 3,000 shares was not in form a sale, we have yet to answer the question whether the transfer of the full 3,300 shares at issue was in substance equivalent to a sale. The Commissioner's second and third alternative contentions are variously that the transfer of the stock was a sham routing of bare legal title through Smalley Corporation and that the alleged capital contribution was not a contribution of securities but in reality a contribution of the proceeds of the sale thereof. We are mindful that the incidence of taxation herein depends upon the substance of the transaction. A sale by one person cannot be transformed for tax purposes into a sale by another using the latter as a conduit through which to pass title. 20 Commissioner v. Court Holding Co., 324 U.S. 331, 333-34 (1945); United States v. General Geophysical Co., 296 F.2d 86 (C.A. 5, 1961). We are *225 mindful also that petitioner was entitled to decrease the amount of his tax liability by means which the law permits. Gregory v. Helvering, 293 U.S. 465 (1935); Motgomery v. Thomas, 146 F.2d 76, 81 (C.A. 5, 1944); Sun Properties v. United States, 220 F.2d 171 (C.A. 5, 1955). Of course it was possible for petitioner to arrange a direct sale of the stock. (In fact petitioner did sell 3,000 pledged shares to reduce Smalley Corporation liabilities on April 20, 1960.) By so doing petitioner would have realized capital gain and would have foregone utilizing Smalley Corporation's 1960 net operating loss carryovers. Those carryovers were not to expire in 1960, however; Smalley Corporation might have carried them to a later year. In cases such as ours, the steps a taxpayer takes to minimize his tax must have a valid business purpose. Gregory, supra; Davant v. Commissioner, 366 F.2d 874, 885 (C.A. 5, 1966), affirming 43 T.C. 540 (1965). We think this it the gist of the Commissioner's arguments going to the substance of the transaction at issue. Each case must be decided on its own merits. United States v. General Geophysica Co., supra, at 88. *226 21 Petitioner advances two reasons for the reduction of the Smalley Corporation indebtedness. First, the lender strongly advocated it; second, petitioner believed that strengthening the corporate balance sheet was a condition to the success of the negotiations with Moxie Co. We think petitioner has proved both reasons. The Commissioner argues in regard to the latter that petitioner could not have been motivated by the Moxie negotiations on the ground that they had been broken off in November 1959. The evidence shows, however, that petitioner was still corresponding actively with Moxie's president subsequent to the transfer of the Hertz stock. We conclude that these reasons furnished a sufficient non-tax purpose for contributing the stock to the capital of Smalley Corporation. Certainly there were many ways to reduce the corporate debt. Petitioner chose to use personal assets - quite appropriately the stock already pledged to secure the debt. To place this property on the corporate balance sheet, either a purchase of Smalley Corporation stock or a capital contribution was necessary. Conrad N. Hilton, 13 T.C. 623, 630 (1949); compare Abbott v. Commissioner, 342 F.2d 997 *227 (C.A. 5, 1965), affirming a Memorandum 22 opinion of this Court, where the finding was that the only purpose of the transaction was tax reduction (no real business purpose) and James M. Hallowell, 56 T.C. 600 (1971), where the transaction resulted in personal gain to the taxpayer. We think those cases are distinguishable on their facts. The Commissioner does not object to the capital donation, the approach finally taken. He demands only a contribution in cash, that is, he objects to petitioner's not having first sold the Hertz stock. Given our determination that petitioner established good reasons for reducing the corporate indebtedness, we do not see why petitioner was required to choose a means to achieve it that was more costly taxwise. See Humacid Co., 42 T.C. 894, 911-13 (1964); Conrad N. Hilton, supra; Sheppard v. United States, 361 F.2d 972, 977 (Ct. Cl. 1966); Grand Rapids Trust Co. Et Al., Administrators, 34 B.T.A. 170 (1936). We think that the Commissioner's additional arguments, for example, that instead of accepting a contribution to its capital, Smalley Corporation ought to have applied part of its *228 liquid assets to reduce liabilities (reducing its total assets thereby), or that 23 Smalley Corporation might have arranged a distribution from its subsidiary, possess the same weakness. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, unless otherwise stated. ↩
*. Discrepancy not explained ↩
2. On brief the Commissioner states that he "is not relying on section 482 of the 1954 Code in the instant case in support of his contention that the gain on the sale of the 3,300 shares of Hertz Corporation common stock is attributable to petitioners." ↩
3. The Commissioner admits that the evidence does not support the same contention as to the 300 shares transferred on January 12, 1960. ↩