R & T DEVELOPERS, INC. v. COMMISSIONER OF INTERNAL REVENUE, Respondent. WILLIAM B. ROBARDS, v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
R & T Developers, Inc. v. Commissioner
Docket Nos. 4781-68, 2346-69.
United States Tax Court
T.C. Memo 1973-128; 1973 Tax Ct. Memo LEXIS 159; 32 T.C.M. (CCH) 551; T.C.M. (RIA) 73128; June 13, 1973, Filed Louis E. Ackerson and Robert L. Ackerson, for the petitioners. Dennis M. Feeley, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNEWALD, Judge: * Respondent determined the following deficiencies in these consolidated cases: 2 Docket No. 4781-68 - R & T Developers, Inc. (hereinafter "R & T") Fiscal year ended
Deficiency April 30, 1964
$1,755.74
April 30, 1965
1,814.20
April 30, 1966
50,859.49
Docket No. 2346-69 - William B. RoBards (hereinafter "RoBards") Year
Deficiency 1965
$38,579.84
1966
17,213.53
*160 Various issues having been resolved or conceded by the parties, the only questions for consideration are: (1) Whether the profit on the sale of two parcels of real estate is taxable to R & T for its fiscal year ended April 30, 1966 or to another corporation known as B & C Investment Corporation (hereinafter "B & C"); and (2) If such profit is so taxable, whether RoBards received a constructive dividend in respect of the 3 transactions involved and, if so, in which taxable year. Some of the facts have been stipulated and are incorporated herein by reference. R & T had its principal place of business in Louisville, Kentucky, at the time the petition herein was filed. It filed timely income tax returns for its taxable years ended April 30, 1964, 1965, and 1966, with the district director of internal revenue, Louisville, Kentucky. RoBards resided in Louisville, Kentucky, at the time his petition herein was filed. He filed timely income tax returns with the district director of internal revenue, Louisville, Kentucky, for 1965 and 1966. RoBards has been a civil engineer for over 40 years (as of the date of trial) and is licensed as such by the state of Kentucky. For *161 some years prior to 1963, he was actively engaged in real estate development for himself and others. At all times relevant herein, he owned at least 50 percent of the outstanding stock of R & T [1] and was the sole stockholder of B & C. He was also president of both corporations from the time of their formations through the years in question. 4 In 1963, RoBards and Tom Thieneman, a builder, began negotiations for the purchase of a tract of land. Financial difficulties, however, caused Thieneman to withdraw from the deal as an investor. RoBards then caused Jeffco, Inc., a then existing corporation wholly owned by him, to purchase the property for $160,000. Jeffco then conveyed the property to R & T. The land was subdivided into 160 lots (including lots 86 and 89, the subject of the hereinafter - described events), prices were placed on each lot, and RoBards, Linda Haggard, and Thieneman attempted to sell them. [2] Additionally, RoBards, Linda Haggard, and Thieneman could purchase any lot in the subdivision so long as they paid R & T the price set for that lot. *162 On August 26, 1963, the Louisville and Jefferson County Planning and Zoning Commission (hereinafter referred to as the Zoning Commission) approved R & T's plans for subdividing at least part of the 5 tract (including lots 86 and 89) for residential use. The envisioned extension of one of the streets to a nearby state highway made lots 86 and 89 particularly suitable for commercial use. On September 12, 1963, B & C was incorporated. Also on this date, an application to have lots 86 and 89 rezoned for commercial use was submitted to the Zoning Commission in the name of "B & C Corporation" as both applicant and owner. The rezoning request was initially rejected by the Zoning Commission, but its decision was overruled in favor of the applicant by the Fiscal Court of Jefferson County on March 10, 1964. On or about February 21, 1965, B & C granted Humble Oil & Refining Company (hereinafter "Humble"), in consideration of $100, a three-month option to purchase Lot 89 for $35,000. The option stated that B & C was the owner of the property. [3]Humble's check was made out to R & T, but it was endorsed by R & T over to B & C and deposited in the latter's bank account. *163 6 On March 10, 1965, in return for $250, B & C granted Standard Oil Company (Kentucky) (hereinafter "Standard") a 120-day option to purchase lot 86 for $35,000. By deeds dated March 19, 1965, R & T conveyed lots 86 and 89 to B & C for $6,500 each, with $1,000 paid at closing and promissory notes from B & C in favor of R & T for the balances. The purchase prices were the values agreed upon by petitioner, Linda Haggard, and Thieneman in 1963. These lots had a fair market value of $35,000 each at the time they were transferred to B & C by R & T. Humble exercised its option and, on June 30, 1965, it purchased lot 89 for $35,000. Standard, however, did not exercise its option, but lot 86 was sold to Louis T. Roth and Boris Pressma for $35,000, also on June 30, 1965. On March 19, 1965, B & C elected to be taxed as a small business corporation under Subchapter S of the Internal Revenue Code of 1954 for its fiscal year ending February 28, 1966. Its return for that year stated it had engaged in "no operations" prior to March 1, 1965. 7 B & C reported the sales of lots 86 and 89 as its own on its tax return for the fiscal year ending April 30, 1966. Respondent *164 determined that the sales by B & C were "sham" and that R & T was the true owner and seller of the lots in question. Accordingly, he removed the profit from the taxable income of B & C, determined that it should be taxable to R & T for its fiscal year ending April 30, 1966, and further determined that RoBards received a constructive dividend in 1966 in the corresponding amount. The question before us as to whether R & T or B & C made the sales is purely factual. James M. Hallowell, 56 T.C. 600, 607 (1971). Its resolution, as we have recently stated in Mark Bixby, 58 T.C. 757, 775-776 (1972): requires us not only to find the surface facts but also to probe the reality of those facts. * * * Also the fact that related * * * parties are involved herein necessitates our close scrutiny. * * * On the other hand, while the petitioners bear the burden of proof herein, their burden cannot be made more onerous by virtue of the character of respondent's allegation. The phrase "sham transaction" is not magical. [Citations omitted.] That the tax advantages of avoiding *165 tax at the corporate level, stemming from the fact that B & C was a Subchapter S corporation while R & T was not, 8 may have furnished the primary motivation is not controlling. See United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 455 (1950). In the final analysis, our decision herein rests upon a determination whether the pattern of events fits the mold of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), or United States v. Cumberland Pub. Serv. Co., supra.In making this determination, we recognized that "the formalities of handling a particular transaction assume a disproportionate importance" and that "the necessary distinctions "may be particularly shadowy and artificial."" (Citation omitted.) See Waltham Netoco Theatres, Inc., 49 T.C. 399, 404 (1968), affd. 401 F. 2d 333 (C.A. 1, 1968); James M. Hallowell, supra.
At the trial, petitioner attempted to prove the existence of a two-year option granted to B & C by R & T in 1963 to purchase the two lots in question for $6,500 each. *166 In our opinion, the evidence in this respect is too meager to support the conclusion that any such option existed, and, indeed, petitioners seem to have abandoned on brief any contention based upon its existence. But the absence of such an option is not necessarily fatal to petitioners' 9 contention that B & C made the sales. We see no need to review all of the elements involved herein which have entered into our consideration as to whether the sales in question were made by R & T or B & C. The elements have been set forth in detail in our findings of fact. It is sufficient to record that, although the issue is not entirely free from doubt, we are satisfied that the role of R & T was sufficiently sanitized so that on balance the circumstances of this case fit the Cumberland mold. Consequently, we hold that the sales in question were made by B & C. Harry H. Hines, Jr. v. United States, F. 2d (C.A. 5, 1973). Compare Merkra Holding Co., 27 T.C. 82 (1956), with Blueberry Land Co., 42 T.C. 1137 (1964), affd. 361 F. 2d 93 (C.A. 5, 1966).[4]
Respondent *167 has also sought to tax RoBards with a constructive dividend stemming from the transactions involved herein. Compare Sammons v. United States, 433 F. 2d 728 (C.A. 5, 1970); John D. Gray, 56 T.C. 1032 (1971). But we need not dwell upon this question. All of the events took place 10 in 1965, so that any constructive dividend to RoBards occurred in that year. Section 1.301-1(b), Income Tax Regs. The fact that the fiscal years of the corporations did not end until 1966 is immaterial. See Gurtman v. United States, 237 F. Supp. 533, 537 (D.N.J. 1965), affirmed per curiam on other issues, 353 F. 2d 212 (C.A. 3, 1965). Respondent has confined his contention on the constructive dividend issue to RoBard's 1966 taxable year. He did not seek to assert such a constructive dividend for 1965 in his deficiency notice nor has he sought to raise the issue by way of an amended pleading. Indeed, the stipulation of facts is capable of being read as a concession by respondent that RoBards did not receive any constructive dividend in that year. [5] Accordingly, we hold that respondent's contention as to the 11 *168 existence of a constructive dividend in 1966 must be rejected. e eI Decisions will be entered under Rule 50. Footnotes
*. Pursuant to a notice of reassignment sent to counsel for all parties, and to which no objections were filed, these cases were reassigned by the Chief Judge on December 11, 1972, from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr.↩, for disposition. 1. Linda Haggard, one of RoBards' employees, apparently owned the other 50 percent. ↩
2. The nature of Thieneman's interest, after his withdrawal as an investor, is not clear, but apparently RoBards worked out some arrangement with him by which he was to receive some share of the expected profits on the land in question without having those profits subject to claims of his creditors. ↩
3. Orginally, the option document listed R & T as the owner, but the parties stipulated that the name of R & T was crossed out and the name of B & C was inserted prior to the time when the signed option was returned to Humble. ↩
4. Compare also Cantera Construction Co., T.C. Memo. 1967-254↩. 5. Paragraph 23 of the Stipulation of Facts reads as follows: It is agreed that the petitioner did not receive a dividend from R & T Developers, Inc., in 1965, and the effect of this stipulation is that adjustment (c) to the Respondent's Statutory Notice of Deficiency for the year 1965 is reversed or eliminated. Adjustment (c) related to another constructive dividend asserted by respondent. ↩