*PAUL W. ADAMS, PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

PAUL W. ADAMS, TRANSFEREE, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6976–74—6981–74.     Filed May 31, 1978.

*See Supplemental Opinion at 70 T.C.  (June 13, 1978).

*Sherin V. Reynolds*, for the petitioner.
*Thomas P. Dougherty, Jr.*, for the respondent.

FAY, *Judge:* In these consolidated cases respondent determined chapter 42 excise tax deficiencies and additions to tax against Paul W. Adams, individually and as transferee of Automatic Accounting Co. (docket No. 6978–74) as follows:

| Docket No. | Taxable period or year | Deficiency[1] | | Penalty or addition to tax | |
|---|---|---|---|---|---|
| | | Sec. 4941(a)(1) | Sec. 4941(b)(1) | Sec. 6684 | Sec. 6651(a) |
| 6977–74 | 12/16/70–12/31/70 | $44.28 | $590.40 | --- | $11.07 |
| | 1971 | 720.00 | 14,400.00 | --- | 180.00 |
| | 1972 | 360.00 | 14,400.00 | --- | 90.00 |
| 6978–74[2] | 1970 | 35,515.10 | 1,420,604.00 | $1,456,119.10 | 8,878.78 |
| | 1971 | 35,515.10 | --- | --- | 8,878.78 |
| | 1972 | 35,515.10 | --- | -.-- | 8,878.78 |
| 6980–74[3] | 12/16/70–12/31/70 | 34.44 | 688.80 | --- | 8.61 |
| | 1/1/71–4/17/71 | 124.53 | 4,981.20 | --- | 31.13 |

Respondent determined additional chapter 42 excise tax deficiencies and additions to tax against Paul W. Adams in docket Nos. 6976–74, 6979–74, and 6981–74. Since all deficiencies and additions to tax asserted by respondent in these three docket numbers were conceded by him at trial, they are not set out above.

Due to further concessions by respondent,[4] the issues remaining for decision are as follows:

(1) Whether the September 11, 1970, conveyance by Automatic Accounting Co. (Automatic) of two parcels of improved real estate to York Square Corp. constituted an act of self-dealing between a disqualified person and a private foundation within the meaning of section 4941.

(2) Whether, following such conveyance, Automatic and petitioner engaged in acts of self-dealing during the taxable periods in which certain mortgage liabilities remained outstanding with respect to the properties conveyed to York Square Corp.

(3) If one or more acts of self-dealing were engaged in by Automatic or petitioner, whether imposition of the tax provided

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

[2]The aggregate liability asserted against Paul W. Adams as transferee is $223,191.21.

[3]Respondent's statutory notice of deficiency in this docket contained two discrepancies which were apparently typographical errors. First, the taxable period listed above as 12/16/70—12/31/70 was listed in respondent's notice as 12/16/70—4/17/71 in addition to the taxable period 1/1/71—4/17/71. Secondly, the tax asserted against Paul W. Adams under sec. 4941(b)(1) was incorrectly listed as sec. 4941(a)(2) by respondent at one point in the notice of deficiency.

[4]At trial, respondent conceded that no act of self-dealing was committed by Automatic Accounting Co. in 1971 or 1972 (docket No. 6978–74) and that the addition to tax under sec. 6651(a) asserted in each of the cases involved herein is inapplicable.

by section 4941(a) is precluded by the "special transitional rule" contained in respondent's regulations.

(4) If Automatic engaged in one or more acts of self-dealing, (a) whether the penalty provided by section 6684 was properly asserted by respondent against Automatic; and (b) whether petitioner, Paul W. Adams, is liable under section 6901, as transferee, for the corporation's unpaid chapter 42 excise taxes.

(5) Whether section 4941, if applicable, violated petitioner's rights under the Fifth Amendment to the Constitution of the United States.

## FINDINGS OF FACT

Some facts have been stipulated and are so found.

Petitioner Paul W. Adams resided in Greenwich, Conn., at the time his petitions herein were filed. Throughout 1970 petitioner, a practicing attorney, was the secretary-treasurer and one of three trustees of the Stone Foundation (foundation), a private foundation exempt from tax under section 501(c)(3). Between January and March of that year, the trustees of the foundation discussed amongst themselves the possibility of making a substantial gift of real property to Yale University (Yale). However, under the provisions of the charter granted the foundation by the State of Ohio, one-half of the total donations made by the foundation was required to be given to Ohio charities. Because of their reluctance to make a matching gift to Ohio charities, the trustees, to circumvent this restriction, initiated steps necessary to change the foundation's State of incorporation from Ohio to Connecticut. To further facilitate the contemplated gift to Yale, on June 1, 1970, York Square Corp. (York), a nonexempt corporation, was formed as a wholly owned subsidiary of the foundation for the purpose of taking title to the real property to be donated to Yale. The initial capitalization of York supplied by the foundation was $700,000.[5]

In an effort to acquire suitable property for donation to Yale, petitioner, in March or April of 1970, entered into negotiations for the purchase of a parcel of improved commercial real estate located at 264 York Street, New Haven, Conn. (hereinafter referred to as property #1). The property consisted of approxi-

---

[5]Petitioner was neither an officer nor a director of York.

mately 2,000 square feet of land and a three-story commercial building, located in the approximate two-block area comprising the heart of the campus shopping district of Yale. The major retail outlets within this area included the extensive Yale Co-op, numerous book shops, boutique clothing outlets, restaurants, and exclusive apparel shops, including Saks 5th Avenue. Petitioner's negotiations were not conducted for the purpose of purchasing the property for himself as principal, but on behalf of the foundation or its subsidiary, York, which was to be formed. The negotiations were successful and led to an agreement dated May 30, 1970, for the purchase of property #1 for $300,000.[6] The agreement designated Automatic Accounting Co., a Delaware corporation of which petitioner held all of the outstanding stock, as the buyer of the property, but provided that Automatic could assign its rights under the agreement to York upon its formation. At the insistence of the seller, payment of the purchase price was to be made on an installment basis secured by a mortgage on the property.

Petitioner's efforts to acquire property #1 in particular for York were motivated in part by the fact that Yale at the time owned most of the real estate in the immediate vicinity of property #1, and in part by the fact that Automatic owned the parcel of improved commercial real estate located at 266 York Street (property #2), a corner lot adjacent to property #1.[7] Property #2 consisted of approximately 1,300 square feet of land and a four-story and basement commercial building of Tudor design and masonry construction.[8] From the outset, petitioner intended that York purchase property #2 in addition to property #1 and that the two properties collectively would constitute the contemplated gift by the foundation to Yale. Sometime during this period petitioner recommended his plan to the other two trustees of the foundation.

In connection with York's acquisition of property #1, a title search was conducted on the property by a New Haven law firm.

---

[6]Petitioner commenced arm's-length negotiations for the property with an informal offer somewhere in the vicinity of $225,000. Counsel for the seller countered with a price in excess of $300,000.

[7]Petitioner, however, did consider the purchase of other properties in the area prior to the acquisition of property #1.

[8]The property was acquired by petitioner in 1962 for $180,000. Subsequently, petitioner expended approximately $28,000 on capital improvements to the building and transferred title to the property to Automatic. The buildings located on the two properties were of similar size.

During the course of this search it was discovered that Automatic, as owner of property #2, had a right of first refusal with respect to property #1, and a lease of a narrow corridor of access to the side street.[9] In order to avoid title problems in the future with respect to property #1, it was determined that Automatic rather than York would purchase property #1 and then convey to York both property #1 and property #2. Pursuant to this plan, Automatic, on August 18, 1970, purchased property #1 for $300,000, and executed a mortgage agreement with the sellers. The amount of the underlying note executed by Automatic was approximately $270,000.

On September 11, 1970, subsequent to the consolidation of title to property #1 and property #2 in Automatic, the corporation conveyed the two properties by warranty deed to York for the total purchase price of $700,000 in cash.[10] At the time, property #1 was encumbered by a mortgage in the amount of $270,000 and property #2 was encumbered by a mortgage in the amount of $94,000. Automatic was the obligor on the notes underlying the mortgages, and it was understood that Automatic or petitioner would render payment on the notes to the mortgagees. Upon receipt of the purchase price from York, an investment account was established by petitioner on behalf of Automatic wherein the amount necessary to amortize the aggregate outstanding liabilities ($364,000) was deposited. Petitioner had personal access to the funds in this account but apparently made no withdrawals therefrom for his personal use.[11]

On December 16, 1970, the board of directors of Automatic voted to dissolve the corporation and on that date distributed its net assets after provision for liabilities to petitioner, its sole shareholder and chief executive. The amount of such distribution was approximately $223,191.

On April 17, 1971, petitioner, as successor to Automatic's

---

[9]It is unclear from the record whether the law firm was engaged by petitioner, Automatic, or York. Nor does the record indicate whether petitioner was conscious of Automatic's rights regarding property #1 at the time the title search was commenced.

[10]Automatic received $300,000 for property #1 and $400,000 for property #2.

[11]While the funds placed in the account earned a significant amount of income, the evidence appears to indicate that such income was used to pay the interest which accrued on the mortgage liabilities.

liabilities, satisfied the mortgage liability outstanding on property #2.[12] Despite attempts by petitioner to substitute other collateral for the mortgage on property #1 and requests by petitioner and counsel for York that the sellers accept prepayment of the underlying note, the mortgage liability outstanding on property #1 was not satisfied until May of 1974.

In January 1972 the Stone Foundation, Inc., a Connecticut corporation, was formed to succeed the Ohio foundation. In December 1972 York was dissolved and its assets distributed to the foundation. Thereafter, on December 27, 1972, the foundation conveyed the two properties to Yale.

At trial, expert testimony and written evidence were presented regarding the fair market value of property #2 on September 11, 1970. Petitioner and respondent each presented two experts qualified to express an opinion as to the value of the property. A third expert presented by petitioner, George W. Conklin, was qualified to express an opinion as to the replacement or reproduction cost of the building situated on the property.

The opinions of the experts are reflected in the following chart:

*Property #2*

| *Petitioner's experts* | *Fair market value—September 1970* |
|---|---|
| George W. Conklin .......... $400,000 | (building only)[13] |
| J. Peter Woods ................. 404,500 | |
| Morris Lefsetz ................. 412,600 | |
| *Respondent's experts* | |
| A. Robert Parente ............ 153,000 | |
| Harold Mogul .................. 129,000 | |

At the conclusion of the trial, and upon consideration of the disparity between the experts' opinions, the Court, accompanied by counsel for both parties, made a thorough inspection of the property.

---

[12]The mortgagee of property #2 would not accept payment on Automatic's note prior to 1971.

[13]This figure is an approximation derived by the Court from the Conklin report. While the report discussed the reproduction cost of the building, the Court experienced considerable difficulty in segregating such cost from the final conclusion expressed by the witness regarding the value of the land *and* building.

## OPINION

Section 501(c)(3) provides for the exemption from Federal income tax of certain charitable organizations, including private foundations as defined by section 509, "no part of the net earnings of which inures to the benefit of any private shareholder or individual."

Prior to the enactment of the Tax Reform Act of 1969, section 503 of the Code imposed arm's-length standards of conduct on dealings between a private foundation and its founders and major contributors to prevent the foundation from being used by such persons for their personal benefit. H. Rept. 91–413 (1969), 1969–3 C.B. 200, 214.[14] Potential sanctions for violation of such standards included the loss of the foundation's exempt status for at least 1 year and the disallowance of deductions to donors for contributions during such period.

The ineffectiveness and inequity of these standards and sanctions, as perceived by Congress, prompted it to include provisions in the Tax Reform Act of 1969 which generally prohibit, rather than regulate, direct or indirect acts of self-dealing between a foundation and certain classes of individuals, and which shift the imposition of sanctions from the foundation to the "disqualified person." S. Rept. 91–552 (1969), 1969–3 C.B. 423, 442–443.

One of these sanctions is contained in section 4941(a)(1) which imposes, upon a "disqualified person," an excise tax equal to 5 percent of the amount involved on each act of self-dealing between such person and a private foundation. In addition to this initial 5-percent tax, subsection (b)(1) imposes a second tier excise tax on such person equal to 200 percent of the amount involved if the act of self-dealing is not timely corrected.[15] With

---

[14] All references to committee reports are to the pages in the Cumulative Bulletin where such reports are reprinted.

[15] The statute provides in part as follows:

SEC. 4941. TAXES ON SELF-DEALING.

(a) INITIAL TAXES.—

   (1) ON SELF-DEALER.—There is hereby imposed a tax on each act of self-dealing between a disqualified person and a private foundation. The rate of tax shall be equal to 5 percent of the amount involved with respect to the act of self-dealing for each year (or part thereof) in the taxable period. The tax imposed by this paragraph shall be paid by any disqualified person (other than a foundation manager acting only as such) who participates in the act of self-dealing. * * *

   *     *     *     *     *     *     *

(b) ADDITIONAL TAXES.—

   (1) ON SELF-DEALER.—In any case in which an initial tax is imposed by subsection (a)(1) on an act

these basic concepts in mind, we turn our consideration to the specific issues presented herein.

### Issue 1. Self-dealing by Automatic—Conveyance of the Properties to York

In 1970 Automatic, a corporation owned by petitioner, acquired title to property #1 and subsequently conveyed it and property #2 which it owned to York, a corporation controlled by the Stone Foundation of which petitioner was a trustee. Automatic received $700,000 on the transaction from York.

Respondent maintains that the foregoing transaction constituted an indirect act of self-dealing between Automatic as a disqualified person and the foundation. Petitioner, of course, disagrees.

Pursuant to section 4941, the term "self-dealing" includes any direct or indirect sale or exchange of property between a private foundation and a disqualified person.[16] Sec. 4941(d)(1)(A). In the present case, it is undisputed that the Stone Foundation is a private foundation within the meaning of section 509 and qualifies as an exempt organization under section 501(c)(3). The term "disqualified person" is defined in section 4946(a).[17] It includes any foundation manager and any corporation in which a foundation manager owns more than 35 percent of the total combined voting power. Petitioner is a foundation manager of

---

of self-dealing by a disqualified person with a private foundation and the act is not corrected within the correction period, there is hereby imposed a tax equal to 200 percent of the amount involved. The tax imposed by this paragraph shall be paid by any disqualified person (other than a foundation manager acting only as such) who participated in the act of self-dealing.

[16]Whether the sale results in a benefit or detriment to the foundation is immaterial for purposes of determining whether an act of self-dealing occurred. Sec. 53.4941(d)–1(a), Foundation Excise Tax Regs.

[17]SEC. 4946. DEFINITIONS AND SPECIAL RULES.

(a) DISQUALIFIED PERSON.—

(1) IN GENERAL.—For purposes of this chapter, the term "disqualified person" means, with respect to a private foundation, a person who is—

\* \* \* \* \* \* \*

(B) a foundation manager (within the meaning of subsection (b)(1)),

\* \* \* \* \* \* \*

(E) a corporation of which persons described in subparagraph (A), (B), (C), or (D) own more than 35 percent of the total combined voting power,

the Stone Foundation by virtue of his position as trustee thereof. Sec. 4946(b)(1).[18] Thus, because petitioner owned 100 percent of its stock and voting power, Automatic was a disqualified person at the time the properties were conveyed to York. Nor is there any dispute that the conveyance of property #2 to York by Automatic constituted a sale or exchange.

Petitioner proffers two arguments in support of his position that no act of self-dealing between Automatic and the foundation occurred upon the conveyance of the properties to York. Petitioner's first argument is that Automatic sold the properties to York, a nonexempt stock corporation. Therefore, concludes petitioner, the transaction simply did not involve any self-dealing between Automatic and a private foundation. Petitioner's contention has no merit. A sale of property by a disqualified person to an organization controlled by a private foundation constitutes an indirect act of self-dealing. Sec. 53.4941(d)–1(b)(4), (5), and (8) example (1), Foundation Excise Tax Regs. For purposes of section 4941, an "organization is controlled by a private foundation" if the foundation through its voting power could require the organization (including a nonexempt corporation) to engage in an act of self-dealing. Sec. 53.4941(d)–1(b)(5), Foundation Excise Tax Regs. The foundation, because of its ownership of all of the voting stock of York, was in control of that corporation. Having rejected petitioner's sole argument with respect to property #2, we hold that the sale by Automatic of that property to York in 1970 constituted an act of self-dealing within the meaning of section 4941.

Petitioner's second argument only concerns property #1. With respect to York's acquisition of that property, petitioner maintains that Automatic's role was that of a mere conduit or nominee and the substance of the transaction should therefore be viewed as the purchase of the property by York from the third party seller. The question thus posed is one of fact, to be determined from consideration of all the surrounding circumstances. See *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950). Upon examination of the record, we agree with petitioner on this point. The substance of a transaction rather

---

[18]SEC. 4946(b). FOUNDATION MANAGER.—For purposes of this chapter, the term "foundation manager" means, with respect to any private foundation—

(1) an officer, director, or trustee of a foundation (or an individual having powers or responsibilities similar to those of officers, directors, or trustees of the foundation), * * *

than its form is determinative of its tax consequences. *Biggs v. Commissioner*, 69 T.C. 905 (1978). Petitioner was a trustee of the foundation and negotiated for the purchase of the property on its behalf. York was formed by the foundation for the specific purpose of acquiring title to the property. From the outset, it was intended by petitioner that York purchase property #1. Petitioner controlled Automatic, a corporation which held legal title to the property for less than 4 weeks. Automatic took title to the property for the sole purpose of eliminating potential title problems in the future. York paid Automatic $300,000 for the property, an amount equal to Automatic's cost therein. In light of these facts, we conclude that Automatic acquired title to property #1 as a mere conduit or nominee of York.

Accordingly, we hold that the substance of the conveyance of title to property #1 from Automatic to York did not constitute a sale or exchange of property for purposes of section 4941. See *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Hallowell v. Commissioner*, 56 T.C. 600 (1971); *Waltham Netoco Theatres, Inc. v. Commissioner*, 49 T.C. 399 (1968), affd. 401 F.2d 333 (1st Cir. 1968).

### Issue 2. Self-dealing—Use of Proceeds by Automatic and Petitioner

The two properties conveyed by Automatic to York on September 11, 1970, were encumbered at the time to the extent of $364,000. Nevertheless, York paid Automatic the full $700,000 purchase price for them in cash, with the understanding that either Automatic or petitioner would satisfy the outstanding mortgage liabilities on the properties. While petitioner made or caused Automatic to make a good faith effort to satisfy the underlying notes or substitute other collateral for the mortgages in 1970 and set aside a portion of the sales proceeds for this purpose, the funds received from York were not placed in escrow, or otherwise placed beyond the reach of Automatic or petitioner. In December 1970 Automatic was dissolved and petitioner, as successor to Automatic's assets and liabilities, satisfied one of the mortgage liabilities in 1971 and the other in 1974.

Respondent contends that Automatic received an implied loan from the foundation in the amount of the outstanding mortgage liabilities ($364,000) by virtue of Automatic's failure to immedi-

ately satisfy such liabilities upon receipt of the funds from York. This, respondent concludes, was an act of self-dealing. We agree.

The direct or indirect lending of money or other extension of credit by a private foundation to a disqualified person constitutes an act of self-dealing. Sec. 4941(d)(1)(B). Notwithstanding the fact that the funds were placed in an investment account, the money was subject to Automatic's direct disposal. Thus, by virtue of York's payment to Automatic on September 11, 1970, the latter corporation received an indirect extension of credit in the amount of $364,000 by the foundation. This constituted an act of self-dealing.

With respect to petitioner, respondent maintains that because the mortgage liabilities were outstanding on the properties and because petitioner succeeded to those liabilities on the liquidation of Automatic, the properties were used by petitioner as collateral for obligations thereafter owed by him.[19] As such, concludes respondent, this "use" during each taxable period involved constituted an act of self-dealing within the meaning of the statute. We agree.

The term "self-dealing" includes any direct or indirect use by a disqualified person of the income or assets of a private foundation. Sec. 4941(d)(1)(E). Section 53.4941(d)–2(f)(1), Foundation Excise Tax Regs., provides in part as follows:

Similarly, the indemnification (of a lender) or guarantee (of repayment) by a private foundation with respect to a loan to a disqualified person shall be treated as a use for the benefit of a disqualified person of the income or assets of the foundation (within the meaning of this subparagraph). * * *

The regulation is applicable here because the existence of the mortgages on the properties following the liquidation of Automatic was tantamount to an indirect guarantee by the foundation of repayment of the underlying debts then owed by petitioner.[20]

Petitioner maintains that no use of the foundation's income or assets occurred because the mortgages were not foreclosed but were, in fact, eventually released. Indeed, argues petitioner, the foundation suffered no damage whatsoever as a result of the aforementioned financial arrangements. Petitioner's argument

---

[19]Respondent did not argue that petitioner also received an implied loan from the foundation by virtue of the financing involved.

[20]The extent of such guarantee would be an amount equal to the lesser of the fair market value of each property or the amount of the mortgage liability outstanding on each property, respectively.

has no support. The legislative history of section 4941 clearly indicates that actual harm to the foundation is not an implied element in the definition of self-dealing. Rather, it is the use of the assets or income of the foundation and the actual or constructive benefit derived by the disqualified person which are the relevant considerations. S. Rept. 91–552, *supra*.

Next, petitioner maintains that the failure by Automatic or him to satisfy the outstanding mortgage liabilities in 1970 or substitute other collateral for such liabilities was not the fault of Automatic or petitioner, but was due to the refusal of the mortgagees to accept prepayment of the notes or a substitution of other collateral. Unfortunately for petitioner, the fact that he may have unwittingly painted himself into a corner by the manner in which he structured the transaction is irrelevant. Sec. 53.4941(a)–1(a)(1), Foundation Excise Tax Regs.

Finally, petitioner argues that it is unfair to apply the strict standard imposed by respondent's regulation with respect to guarantees of repayment since the regulation was not adopted until 1973, some 3 years after the sale by Automatic to York occurred. Suffice it to say that petitioner's argument ignores the retroactive effect of respondent's regulation.[21] Sec. 7805(b); sec. 53.4941(f)–1(a), Foundation Excise Tax Regs.

Accordingly, we hold that the failure to timely remove the encumbrances on the properties resulted in acts of self-dealing by Automatic and petitioner following the liquidation of Automatic.[22]

### Issue 3. Applicability of the Initial Tax Provided by Section 4941(a)

Having determined that Automatic and petitioner both engaged in acts of self-dealing, we next consider whether the initial 5-percent excise tax imposed by section 4941(a) is applicable in this case.

In this regard, section 53.4941(f)–1, Foundation Excise Tax Regs., provides in part as follows:

(a) *In general.* Except as provided in paragraph (b) of this section, sections

---

[21]Respondent's regulations do provide for certain transitional rules which are discussed *infra*.

[22]With respect to Automatic, we held that an implied loan to the corporation by the foundation occurred indirectly. However, we recognize that the collateral theory advanced by respondent against petitioner would also be applicable to Automatic in any event.

53.4941(a)–1 through 53.4941(e)–1 shall apply to all acts of self-dealing engaged in after December 31, 1969.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(b)(2) *Special transitional rule.* In the case of an act of self-dealing engaged in prior to July 5, 1971, section 4941(a)(1) shall not apply if—

(i) The participation (as defined in section 53.4941(a)–1(a)(3)) by the disqualified person in such act is not willful and is due to reasonable cause (as defined in section 53.4941(a)–1(b)(4) and (5)),

(ii) The transaction would not be a prohibited transaction if section 503(b) applied, and

(iii) The act is corrected (within the meaning of section 53.4941(e)–1(c)) within a period ending July 16, 1973, extended (prior to the expiration of the original period) by any period which the Commissioner determines is reasonable and necessary (within the meaning of section 53.4941(e)–1(d)) to bring about correction of the act of self-dealing.

Respondent maintains that neither Automatic nor petitioner qualifies for the relief from liability afforded by the above transition rule. Specifically, respondent argues that the participation by Automatic and petitioner in the acts of self-dealing previously discussed was not due to reasonable cause.[23]

Section 53.4941(a)–1(b)(5), Foundation Excise Tax Regs., provides that a person's "participation is due to reasonable cause if he has exercised his responsibility on behalf of the foundation with ordinary business care and prudence."

The first act of self-dealing engaged in by Automatic was the sale of property #2 to York. Respondent maintains that ordinary business care and prudence were not exercised by Automatic on the sale of this property to York on September 11, 1970, because the property was worth only a small fraction of the $400,000 price paid for it. Petitioner counters that the property was worth at least $400,000 on such date.

The question thus presented is one of fact, to be determined from consideration of all relevant evidence in the record. *Kaplan v. Commissioner,* 43 T.C. 663, 665 (1965).

Petitioner and respondent each offered the testimony of two

---

[23]Respondent further argues that none of the acts of self-dealing which occurred have been corrected. In view of respondent's concession that pursuant to sec. 53.4941(e)–1(d)(2)(*i*), Foundation Excise Tax Regs., the correction period has not yet expired, we find this argument to be premature. Respondent has taken the position on brief that petitioner may correct the acts of self-dealing committed by Automatic. We agree. In addition, respondent on brief concedes that the requirement set out in sec. 53.4941(f)–1(b)(2)(*ii*), Foundation Excise Tax Regs., is not applicable in this case. Petitioner, of course, agrees. We merely deem the point conceded for purposes of this case.

expert witnesses who were qualified to express an opinion as to the fair market value on September 11, 1970, of property #2.[24]

Petitioner's two experts, J. Peter Woods and Morris Lefsetz, expressed opinions that on September 11, 1970, property #2 had a fair market value of $404,500 and $412,600, respectively. The approach utilized by both witnesses in valuing the property was the depreciated replacement cost or reproduction cost technique with respect to the building, and the market data or comparable sales technique with respect to the land.

Respondent's experts, A. Robert Parente and Harold Mogul, expressed opinions that on September 11, 1970, property #2 was worth $153,000 and $129,000, respectively. In arriving at these figures respondent's experts relied principally on the capitalization of income approach.

Our primary difficulty with the opinions expressed by respondent's experts is the approach utilized by them in light of the location, construction, and unusual design of the property as improved. We are mindful that the capitalization of income approach is sometimes relied upon in determining the fair market value of commercial real estate. This method, however, assumes that the income produced by the property when capitalized at a selected rate is an accurate reflection of the price the property could command in the market. This is often but not always true. For example, an investor might purchase real estate primarily as a hedge against inflation with the expectation of realizing long-term appreciation on the property and favorable tax treatment on its disposition. To such person, the annual rental income the property could generate would not be the only consideration involved in determining what the property was worth. Indeed, it would appear that many of the so-called real estate tax shelters derive most of their value from such expectations and income tax considerations. Thus, the rigid application of empirical formulas to the exclusion of other factors is not always appropriate in determining the value of real estate. We believe its use by respondent in the present case ignores reality. Indeed, after observing the general area, the close proximity of the property to Yale, and other factors, we simply do not share respondent's view that property #2, which

---

[24]In addition, petitioner offered the testimony of a third expert witness who was qualified to express an opinion as to the replacement or reproduction cost of the building situated on the property. However, we did not find the evidence presented by this witness to be particularly helpful.

was acquired by petitioner in 1962 for $180,000 and which received capital improvements of approximately $28,000, was worth, some 8 years later, thousands of dollars less than its original cost to petitioner.[25] On the other hand, we do not infer by our comments a general preference for the replacement or reproduction cost approach to valuation. To the contrary, we believe such approach is of limited value in appraising most commercial real estate. We resort to it here with respect to the building involved, due to the absence of a realistic alternative offered by respondent and the unusual circumstances presented by this case.

We have carefully considered the opinions proffered by the expert witnesses, together with their credibility and qualifications. Based on our analysis of the record and on-site inspection of the property, we conclude that on September 11, 1970, the fair market value of property #2 was at least $400,000.

In view of the identity between the fair market value of the property and the price paid for it by York, petitioner's investigation of other properties in the area, the prior knowledge and tacit approval of the transaction by the other two trustees, the unusual nature of the property, the divergence of expert opinion as to what the property was worth in 1970, and the lack of knowledge on the part of petitioner, as chief executive of Automatic, that such sale constituted an act of self-dealing, we believe that Automatic's sale of property #2 to York was due to reasonable cause. Accordingly, we hold that provided the "sale" act of self-dealing by Automatic is timely corrected, the transition rule applies to such act and the initial tax of section 4941(a)(1) is not applicable thereto.

Next we consider whether either Automatic or petitioner exercised ordinary business care and prudence in their failure to timely remove the encumbrances on the properties. As previous-

---

[25]Respondent having determined that the conveyance by Automatic of property #1 to York constituted an act of self-dealing, evidence was presented at trial concerning the fair market value of property #1. In the opinion of respondent's experts, property #1 was worth only slightly less than property #2 and *both* properties together were worth substantially less than the $300,000 price paid for property #1. We find this incredulous in view of the arm's-length nature of the negotiations for the purchase of property #1 and the considerable difference in appearance, condition, and relative location between that property and property #2. While our holding that the conveyance of property #1 to York did not involve an act of self-dealing renders a determination of the value of that property unnecessary, such evidence is relevant in weighing the credibility of respondent's witnesses who testified.

ly discussed, such failure constituted self-dealing on the part of Automatic and petitioner.

Petitioner appears to argue that the participation by Automatic and petitioner in such acts was due to reasonable cause since it was the mortgagees who refused prepayment of the underlying debts or a substitution of other collateral for the mortgages. We rejected this argument in determining that acts of self-dealing occurred and find it equally unpersuasive with respect to the question of reasonable cause.

Under the circumstances presented, it is not the mere existence of the mortgages which is fatal to petitioner's argument; rather, it is the casual manner in which the situation was handled that confounds established principles of ordinary business care and prudence. At a minimum, an escrow account or a cash bond in favor of York should have been utilized by Automatic and petitioner. Their failure to provide for these or similar safeguards renders the imposition of the initial tax provided by section 4941(a) proper. Of course, if such acts are timely corrected, the tax imposed by section 4941(b)(1) will not apply.

### Issue 4(a). Section 6684 Penalty

Section 6684, enacted as part of the Tax Reform Act of 1969, provides in part as follows:

> If any person becomes liable for tax under any section of chapter 42 (relating to private foundations) by reason of any act or failure to act which is not due to reasonable cause and either—
>
> *        *        *        *        *        *        *
> (2) such act or failure to act is both willful and flagrant,
> then such person shall be liable for a penalty equal to the amount of such tax.

It is respondent's position that Automatic is liable for the penalty provided by section 6684 due to its willful and flagrant participation in the "sale" and "use" acts of self-dealing previously discussed. We disagree.

We have held that Automatic's participation in the "sale" act of self-dealing was due to reasonable cause. In addition, the terms "willful" and "flagrant" mean the voluntary, conscious, and knowing commission of a gross violation of certain provisions of chapter 42, including section 4941. Sec. 301.6684–1(c), Proced. & Admin. Regs.; sec. 1.507–1(c)(2), Income Tax

Regs. In the present case the evidence indicates that the acts of self-dealing committed by Automatic were neither willful nor flagrant.

Accordingly, we hold that the penalty provided by section 6684 is inapplicable in this case.

### Issue 4(b). Transferee Liability

Respondent has asserted transferee liability in equity against petitioner under section 6901 for the deficiency determined with respect to Automatic.

Section 6901 provides that in certain cases, respondent may proceed directly against a transferee of property for the assessment and collection of excise taxes owed by the transferor. Sec. 6901(a)(2). The statute, however, merely affords respondent a procedural remedy and does not create or define the existence or extent of the transferee's liability. *Dillman v. Commissioner*, 64 T.C. 797, 800 (1975). Rather, the substantive liability of a transferee at law or in equity is a matter determined by State law. *United States v. Bess*, 357 U.S. 51 (1958); *Commissioner v. Stern*, 357 U.S. 39 (1958).

In the present case, petitioner received an amount in excess of $223,000 upon the liquidation of Automatic in December 1970. We have held that Automatic engaged in an act of self-dealing, for which the tax imposed by section 4941 accrued prior to its liquidation. Finally, the liquidating distribution was without consideration and rendered the corporation insolvent in view of the liability for such tax which had accrued. See *Kreps v. Commissioner*, 351 F.2d 1 (2d Cir. 1965); *Coca-Cola Bottling Co. of Tucson v. Commissioner*, 37 T.C. 1006 (1962), affd. 334 F.2d 875 (9th Cir. 1964).

Respondent maintains that under Connecticut law the foregoing facts include all of the elements necessary to constitute a fraudulent conveyance and thus establish petitioner's transferee liability in equity. We agree. The relevant Connecticut statute, Conn. Gen. Stat. Rev. sec. 52–552 (1960), provides as follows:

All fraudulent conveyances, suits, judgments, executions or contracts, made or contrived with intent to avoid any debt or duty belonging to others, shall, notwithstanding any pretended consideration therefor, be void as against those persons only, their heirs, executors, administrators or assigns, to whom such debt or duty belongs.

Under Connecticut law constructive fraud is present if a

conveyance is without consideration and renders the transferor insolvent. *Peerless Mfg. Co. v. Goehring*, 131 Conn. 93, 38 A.2d 5 (1944); *Second Nat. Bank of New Haven v. Harris*, 122 Conn. 180, 187 A. 910 (1936); cf. *Prospect Realty, Inc. v. Bishop*, 33 Conn. Supp. 622, 365 A.2d 638 (Sup. Ct. 1976).

Petitioner does not dispute respondent's interpretation of Connecticut law. He contends that since Automatic was a Delaware corporation, Connecticut law is irrelevant. Under Delaware law, argues petitioner, respondent must first obtain a timely judgment against Automatic prior to the assertion of transferee liability against petitioner. Thus, petitioner takes the position that since respondent failed to proceed against Automatic within the period prescribed by the Delaware statute of limitations, petitioner cannot be held liable as the transferee of Automatic.

Petitioner's argument has no merit. The applicable State law is determined by where the transfer occurred, which in this case was Connecticut. *Fibel v. Commissioner*, 44 T.C. 647 (1965); *Estate of Miller v. Commissioner*, 42 T.C. 593 (1964). Furthermore, it is unnecessary to proceed against the transferor where, as here, to do so would be a futile act. *Kreps v. Commissioner, supra; Ginsberg v. Commissioner*, 305 F.2d 664 (2d Cir. 1962); *Coca-Cola Bottling Co. of Tucson v. Commissioner, supra;* see *Maher v. Commissioner*, 55 T.C. 441 (1970), affd. on this issue 469 F.2d 225 (8th Cir. 1972).

Accordingly, we hold that petitioner is liable, as transferee, for the chapter 42 excise tax deficiencies of Automatic.

### Issue 5. Constitutionality of Section 4941

Petitioner, on brief, contends that the multiple incidence of taxation imposed by section 4941 is onerous and represents an arbitrary and capricious confiscation of his property which violates the due process clause of the Fifth Amendment.

Petitioner's contention is unsound. Section 4941, on its face, merely provides for the orderly and structured imposition of excise taxes on transactions defined as "self-dealing." The tax provided by section 4941(a)(1) is a modest 5 percent of the amount involved. While the additional tax provided by section 4941(b)(1) is equal to 200 percent of the amount involved, Congress saw fit to ameliorate its effect by providing for a

correction period. Thus, petitioner's argument that section 4941 imposes taxes at a confiscatory level is rendered meaningless.

Moreover, since the tax involved is productive of revenue it is not invalid merely because it deters the activities taxes. *United States v. Kahriger*, 345 U.S. 22 (1953); *Sonzinsky v. United States*, 300 U.S. 506 (1937). Nor is it within the province of courts to determine the constitutionality of a tax by inquiry into the motives which may have moved Congress to enact it. *Sonzinsky v. United States, supra; United States v. Ross*, 458 F.2d 1144 (5th Cir. 1972); cf. *Sakol v. Commissioner*, 574 F.2d 694 (2d Cir. 1978), affg. 67 T.C. 986 (1977).

*Decisions will be entered for the petitioner in docket Nos. 6976–74, 6979–74, and 6981–74.*

*Decisions will be entered under Rule 155 in docket Nos. 6977–74, 6978–74, and 6980–74.*