ANTON LAMBOS AND OLGA LAMBOS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 34318-83.     Filed June 1, 1987.

*Paul J. Stergios*, for the petitioners.
*Carol A. Szczepanik*, for the respondent.

OPINION

HAMBLEN, *Judge*: Respondent determined deficiencies of excise tax imposed under section 4975(a)[1] as follows:

| Petitioner | TYE | Deficiency |
|---|---|---|
| Olga Lambos (Olga) | 1976 | $228.00 |
| | 1977 | 684.00 |
| | 1978 | 1,140.00 |
| | 1979 | 1,596.00 |
| | 1980 | 2,052.00 |
| | 1981 | 2,508.00 |
| Anton Lambos (Anton) | 1976 | 487.50 |
| and Olga Lambos | 1977 | 975.00 |
| | 1978 | 1,462.50 |
| | 1979 | 1,950.00 |
| | 1980 | 2,437.50 |
| | 1981 | 2,925.00 |

The issues for decision are (1) whether petitioners are disqualified persons within the meaning of section 4975(e)(2); (2) whether certain lease transactions were prohibited transactions within the meaning of section 4975(c); and (3) whether the amount involved within the meaning of section 4975(f)(2) is determined by considering the subject leases to be separate prohibited transactions on the day the transactions occur and continuing on the first day of each taxable year within the taxable period.

Some of the facts have been stipulated and are incorporated herein by this reference.

Anton and Olga are husband and wife. At the time the petition herein was filed, petitioners' legal residence was Canton, Ohio.

Anton owned 100 percent of the shares of stock of a corporation, Kendall House, Inc., during the years ended December 31, 1976, through December 31, 1979. During the year ended December 31, 1980, the stock of Kendall House, Inc., was owned by Anton and the three sons of the petitioners as follows:

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

| Shareholder | Percentage of total ownership |
|---|---|
| Anton. | 97% |
| George Lambos | 1 |
| Earnest Lambos | 1 |
| Nicholas Lambos | 1 |

During the year ended December 31, 1981, the stock of Kendall House, Inc., was owned by Anton and the three sons of the petitioners as follows:

| Shareholder | Percentage of total ownership |
|---|---|
| Anton. | 94% |
| George Lambos | 2 |
| Earnest Lambos | 2 |
| Nicholas Lambos | 2 |

Kendall House, Inc., as employer, maintained a profit-sharing plan for its employees for the years ended December 31, 1976, through December 31, 1981. Harter Bank & Trust Co. was the trustee of the Kendall House, Inc., Profit Sharing Trust and Plan (the plan) for the years ended December 31, 1976, through December 31, 1981. Anton was a participant in the plan.

During the years ended December 31, 1976, through December 31, 1981, the plan owned real property located at 4110 Hills and Dales Road (Hills and Dales Road), 2303 West Tuscarawas Avenue (West Tuscarawas Avenue), and 2815 Cleveland Avenue (Cleveland Avenue). Each parcel of real property was located in Canton, Ohio. A franchised Kentucky Fried Chicken restaurant was located on each parcel of such real property.

The real property located at West Tuscarawas Avenue was transferred to the plan by Kendall House, Inc., on December 16, 1976. The building and improvements to the land located at West Tuscarawas Avenue were owned by Olga during the years ended December 31, 1976, through December 31, 1981. The land located at West Tuscarawas Avenue was leased to Olga by the plan for a 15-year period beginning on July 1, 1976, and ending on June 30, 1991. The amount of rent paid to the plan by Olga with respect to the property located at West Tuscarawas Avenue was $4,560 during the year ended December 31, 1976, and

$9,120 annually for the years ended December 31, 1977, through December 31, 1981.

The real property located at Hills and Dales Road was transferred to the plan by Anton on November 29, 1974. The building and improvements to the land located at Hills and Dales Road were owned by Anton during the years ended December 31, 1976, through December 31, 1981. The land located at Hills and Dales Road was leased to petitioners by the plan for a 2-year period beginning on December 1, 1974, and ending November 30, 1976, with a right to renew the lease for three additional periods of 2 years each. Petitioners exercised their right to renew the lease relating to Hills and Dales Road through the year ending December 31, 1981. The amount of rent paid to the plan by the petitioners with respect to the property located at Hills and Dales Road was $9,750 for the years ended December 31, 1976, through December 31, 1981.

The lease of the land located at Cleveland Avenue to petitioners from the plan is not considered a prohibited transaction for purposes of section 4975 because such lease was executed pursuant to a binding contract in effect on July 1, 1974.

Scott Swallen, C.P.A. (Swallen), maintained that each parcel of real property was located, in demographic terms, within separate and distinct areas. The West Tuscarawas Avenue property is located in a commercial area accompanied by transient traffic between Canton and Massillon, Ohio. The Hills and Dales Road property is located in a residential area of Canton, Ohio. The franchised restaurants located on each parcel of real property are brick and frame construction and are possibly adaptable to other commercial uses.

Petitioners did not secure a special exemption pursuant to section 4975(c)(2) from the provisions of section 4975(a) for the subject leases of property located at West Tuscarawas Avenue or Hills and Dales Road.

The subject leases between the petitioners and the plan are no longer in effect. On May 10, 1982, the real property located at Hills and Dales Road, West Tuscarawas Avenue, and Cleveland Avenue was sold by the plan to Anton for the amount of $265,000 and a $15 transfer charge.

The plan provisions specifically authorized that the plan may invest in "such other property, real or personal, within the United States, as the Trustee may deem advisable, subject to the provisions of sections 404 and 406 of ERISA."

The employer maintaining the plan was a corporation, Kendall House, Inc.

Respondent, in the statutory notices of deficiency, informed petitioners that, as to the explanation of items—

It is determined that you participated in loan transactions. At the time of the loans, you were a disqualified person within the meaning of section 4975 of the Internal Revenue Code; therefore, the loans constituted a prohibited transaction as defined by section 4975 of the Internal Revenue Code. Consequently, you are liable for the five percent (5%) initial excise tax imposed by section 4975(a) of the Internal Revenue Code.

At trial, respondent conceded that petitioners were not involved in any prohibited loan transactions within the meaning of section 4975. Petitioners assert that the burden of proof as to any matter not in the statutory notices of deficiency shall be on respondent. Rule 142(a).[2] Respondent states that the language of the statutory notices of deficiency did not deceive petitioners and that petitioners had notice of the relevant provisions of the Internal Revenue Code regarding prohibited transactions. We agree with respondent since the statutory theory and statutory analysis regarding prohibited transactions concerning loans and leases do not constitute a new matter in this instance. Petitioners were not deceived by the reference to loans within the statutory notices of deficiency, and petitioners had notice that the prohibited transactions as determined by respondent concerned the subject leases. Nonetheless, our determinations herein are not premised upon the burden of proof and would remain unaltered irrespective of whether petitioners or respondent bears the burden of proof. Petitioners do not assert that respondent failed to determine the amount of deficiency pertaining to the specific years at issue as required by section 6212(a), nor do we question whether respondent has issued valid statutory notices of deficiency. Compare *Scar v. Commissioner*, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983).

---

[2] Unless otherwise stated, all Rule references are to the Tax Court Rules of Practice and Procedure.

As we embark upon the Odyssey mandated by the interrelationships and cross-references of section 4975 and the applicable provisions of the Employee Retirement Income Security Act of 1974 (ERISA), we are reminded of the following comments of Judge Learned Hand:

the words of such an act as the Income Tax * * * merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of—leave in my mind only a confused sense of some vitally important, but successfully concealed, purport, which it is my duty to extract, but which is within my power, if at all, only after the most inordinate expenditure of time. I know that these monsters are the result of fabulous industry and ingenuity, plugging up this hole and casting out that net, against all possible evasion; yet at times I cannot help recalling a saying of William James about certain passages of Hegel: that they were, no doubt, written with a passion of rationality; but that one cannot help wondering whether to the reader they have any significance save that the words are strung together with syntactical correctness. * * * [Hand, "Thomas Walter Swan," 57 Yale L. J. 167, 169 (1947).]

Section 4975, as added to the Internal Revenue Code by title II of ERISA, Pub. L. 93-406, sec. 2003, 88 Stat. 829, 971, imposes two levels of excise tax on a prohibited transaction which is to be paid by any "disqualified person" who participates in the "prohibited transaction." Section 4975(a) provides for an initial tax equal to 5 percent of the "amount involved" with respect to the prohibited transaction. Section 4975(b) imposes an additional tax equal to 100 percent of the amount involved, if the prohibited transaction is not timely corrected.[3] The term "prohibited transaction" includes any direct or indirect sale or exchange or leasing of any property between a plan and a disqualified person. Sec. 4975(c)(1)(A). Section 4975(e)(2)(E) provides that the term "disqualified person" includes any person who is an owner, directly or indirectly, of 50 percent or more of the combined voting power of all classes of stock entitled to vote or the total value of shares of all classes of stock. Section 4975(e)(2)(F) provides that the term "disqualified person" includes any family member of any individual

---

[3]Petitioners corrected the prohibited transaction as determined by respondent on May 10, 1982, by sale of each subject real property by the Kendall House, Inc., Profit Sharing Trust and Plan to petitioner Anton Lambos. Therefore, the additional tax, a second-tier tax imposed by sec. 4975(b), is not applicable as the prohibited transaction as determined by respondent was corrected within the correction period.

described in subparagraphs (A), (B), (C), or (E) of section 4975(e)(2). Section 4975(e)(6) defines a spouse as a member of family for purposes of section 4975(e)(2)(F).

The parties have stipulated to the existence of the subject lease transactions between petitioners and the plan with respect to the subject real property owned by the plan located at Hills and Dales Road and West Tuscarawas Avenue. Anton owned at least 94 percent of the combined voting power of all classes of stock entitled to vote and the total number of shares of all classes of Kendall House, Inc., stock during the years at issue. Olga was the spouse of Anton during the years at issue. Each petitioner was a disqualified person within the meaning of section 4975(e)(2)(E) and section 4975(e)(2)(F) during the years at issue. Consequently, the subject leases are prohibited transactions within the meaning of section 4975(c)(1)(A) unless otherwise satisfying an exemption as specified in section 4975(d).

The exemption within section 4975(d)(13) provides that the prohibitions of section 4975(c) shall not apply to any transaction which is exempt from section 406 of ERISA by reason of the exemptions within section 408(e) of ERISA.[4] Section 408(e) of ERISA provides that the prohibitions of section 406 of ERISA shall not apply to the acquisition, sale, or lease by a plan of "qualifying employer real property" as defined in section 407(d)(4) of ERISA provided such acquisition, sale, or lease is for adequate consideration, no commission is charged with respect thereto, and the plan is an eligible individual account plan as defined in section 407(d)(3) of ERISA. Sec. 408(e), ERISA. No commissions were charged with respect to the subject lease transactions and the plan is an eligible individual account plan. Based on our determinations herein, we need not address the adequate consideration requirement of section 408(e) of ERISA.[5]

Petitioners assert that the subject lease transactions concern "qualifying employer real property" within the meaning of sections 407(d)(4) of ERISA and that the subject

---

[4]ERISA prohibitions affect "parties in interest" and the Internal Revenue Code provisions affect "disqualified persons." The two terms are substantially the same in most respects, but the ERISA term includes a somewhat broader range of persons. See H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 468.

[5]See generally *Capital City Excavating Co. v. Commissioner*, T.C. Memo. 1984-193.

lease transactions are exempt from section 406 of ERISA by reason of section 408(e) of ERISA. Consequently, petitioners assert that section 4975(d)(13) provides an exemption to the subject lease transactions such that respondent erred in the determination that the subject lease transactions constituted prohibited transactions subject to the tax imposed within section 4975. Respondent determined that the subject lease transactions constituted prohibited transactions within the meaning of section 4975(c) and that the exemption of section 4975(d)(13) is not applicable because the subject lease transactions did not concern "qualifying employer real property" within the meaning of section 407(d)(4) of ERISA.

Petitioners' assertion is conditioned upon the determination as to whether the subject lease transactions concern "employer real property" within the meaning of section 407(d)(2) of ERISA and, if so, whether the subject lease transactions concern employer real property constituting "qualifying employer real property" within the meaning of section 407(d)(4) of ERISA.[6] Solely for the purposes of our determinations herein, we assume, arguendo, that the subject lease transactions concern employer real property.[7]

---

[6] Sec. 407 of ERISA provides as follows:

Sec. 407(a) Except as otherwise provided in this section and section 414:
(1) A plan may not acquire or hold—

\*    \*    \*    \*    \*    \*    \*

(B) any employer real property which is not qualifying employer real property.

\*    \*    \*    \*    \*    \*    \*

(d) For purposes of this section —

\*    \*    \*    \*    \*    \*    \*

(2) The term "employer real property" means real property (and related personal property) which is leased to an employer of employees covered by the plan, or to an affiliate of such employer. \* \* \*
(4) The term "qualifying employer real property" means parcels of employer real property —
(A) if a substantial number of the parcels are dispersed geographically;
(B) if each parcel of real property and the improvements thereon are suitable (or adaptable without excessive cost) for more than one use;
(C) even if all such real property is leased to one lessee (which may be an employer, or an affiliate of an employer); and
(D) if the acquisition and retention of such property comply with the provisions of this part (other than section 404(a)(1)(B) to the extent it requires diversification, and sections 404(a)(1)(C), 406, and subsection (a) of this section).

[7] The term "employer real property" means real property which is leased to an employer of employees covered by a plan, or to an affiliate of such employer. Sec. 407(d)(2), ERISA. A person other than a corporation shall be treated as an affiliate of an employer to the extent provided in regulations of the Secretary of Labor after consultation and coordination with the

ERISA provisions provide that a plan may not acquire or hold any employer real property which is not qualifying employer real property. Sec. 407(a)(1)(B), ERISA. The term "qualifying employer real property" means parcels of employer real property otherwise satisfying the requirements of section 407(d)(4) of ERISA. We have assumed, arguendo, that the subject lease transactions are defined as employer real property. Our next level of inquiry is to determine whether the subject lease transactions are defined as qualifying employer real property.

The term "qualifying employer real property" means parcels of employer real property where, in addition to certain other requirements, a substantial number of the parcels are dispersed geographically and where each parcel of real property and the improvements on it are suitable, or adaptable without excessive cost, for more than one use. Sec. 407(d)(4)(A), (B), ERISA. The legislative history indicates an intention that:

> the plan might acquire and lease to the employer multipurpose buildings which are located in different geographical areas. It is intended that the geographic dispersion be sufficient so that adverse economic conditions peculiar to one area would not significantly affect the economic status of the plan as a whole. All of the qualifying real property may be leased to one lessee, which may be the employer or an affiliate of the employer. [H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 479.]

Franchised Kentucky Fried Chicken restaurants were located on each parcel of real property leased by petitioners from the plan. Petitioners assert that substantial market differences exist among the locations of the property leased by petitioners from the plan. Swallen, petitioners' accountant, maintains that the Hills and Dales Road property is located within an upper middle class residential area, that West Tuscarawas Avenue caters to transient traffic, "hospi-

Secretary of the Treasury. Sec. 407(d)(7), ERISA. No such regulations have been issued. The subject lease transactions were executed between the plan and petitioners in their individual capacity, not between the plan and Kendall House, Inc., the employer of employees covered by the plan. A prerequisite to the determinations that the subject lease transactions concerned employer real property requires the determination that petitioners in their individual capacity acted as an affiliate of Kendall House, Inc., the employer of employees covered by the plan. We decline to determine whether petitioners in their individual capacity acted as an affiliate of Kendall House, Inc., and assume, arguendo, that petitioners were affiliates of Kendall House, Inc. Consequently, we assume without determination that the subject lease transactions concern employer real property within the meaning of sec. 407(d)(2) of ERISA.

tal employees, some blue-collar and middle class citizens, while the Cleveland Avenue location caters to blue-collar workers and farmers."[8] Swallen maintains that each parcel of real property was located in separate and distinct areas of Stark County, Ohio, such that a substantial number of the parcels are dispersed geographically within the meaning of section 407(d)(4)(A) of ERISA. We do not agree.

The Conference report is clear that the geographic dispersion standard (sec. 407(d)(4)(A), ERISA) and the multipurpose use standard (sec. 407(d)(4)(B), ERISA) codified as part of the qualifying employer real property definition are intended to safeguard plan investments against adverse economic conditions peculiar to one area. Geographic dispersement, in the context of congressional intent patently obvious in the ERISA provisions and committee reports, connotes a wide spread range or distribution in varied directions and locations. In our view, the Hills and Dales Road property and the West Tuscarawas Avenue property are not dispersed geographically. An adverse economic condition peculiar to Stark County, Ohio, would significantly affect the economic status of the plan as a whole. We believe that Congress did not intend to include the employer real property at issue within the meaning of qualifying employer real property for purposes of section 407(d)(4)(A) of ERISA. The economic differences between the Hills and Dale Road property and the West Tuscarawas property are minimal, such that any economic downturn would certainly affect each property in a similar manner. Notwithstanding petitioners' assertions that the demographics of each parcel of real property embody distinct and disparate market conditions so as to protect the plan investment, we find that the subject parcels of real property are not dispersed geographically. We discern no other substantial safeguards to ensure that the assets of the plan are protected against adverse economic conditions or other safeguards against perceived abuses of plan assets. Furthermore, we note that section 404(a)(1)(C) of ERISA imposes a fiduciary duty to diversify the investments of any plan so as to minimize the risk of

[8] The Cleveland Avenue property does not involve a prohibited transaction for purposes of sec. 4975 because such lease was executed pursuant to a binding contract in effect on July 1, 1974.

large losses, unless under the circumstances it is clearly prudent not to do so. The Conference report indicates that geographic dispersion of plan investments is a relevant factor to consider in the determination as to whether a plan satisfies the investment diversification standard. H. Rept. 93-1280 (Conf.) (1974), 1974-3 C.B. 415, 465. The attendant circumstances do not establish that the absence of geographic dispersion is clearly prudent.

Congress specifically provided a special exemption procedure by which the Secretary of the Treasury after consultation and coordination with the Secretary of Labor may grant a conditional or unconditional exemption to any disqualified person. Sec. 4975(c)(2). In this context, the legislative history states:

> In addition, the conferees recognize that some individual transactions between a plan and party-in-interest may provide substantial independent safeguards for the plan participants and beneficiaries and may provide substantial benefit to the community as a whole, so that the transaction should be allowed under a variance. * * * [H. Rept. (Conf.), *supra*, 1974-3 C.B. at 471.]

The Conference report refers to a specific redevelopment project of a joint venture in Dayton, Ohio, in which a pension plan of a major corporation has committed to invest. The employer of employees covered by such plan intended to lease a portion of an office building which was a key element of the redevelopment project from the joint venture. Unless specifically exempted, such transaction would be a prohibited transaction. The Conference report cites the presence of specific substantial safeguards, such that the variance or special exemption under section 4975(c)(2) is warranted. Here, petitioners did not avail themselves of the special exemption procedure of section 4975(c)(2). Nonetheless, the focus of the special exemption procedure of section 4975(c)(2), as evidenced within the Conference report, is whether substantial safeguards are present to ensure that plan assets are protected from adverse economic conditions as well as protected against the misuse of plan assets by fiduciaries or other disqualified persons. No such substantial safeguards as indicated in the Conference report are present in the instant case.

We determine that the subject lease transactions do not concern qualifying employer real property because such properties are not dispersed geographically. Sec. 407(d)(4)(A), ERISA. Consequently, the subject lease transactions are not exempted by section 4975(d)(13) because such leases do not concern qualifying employer real property as defined in section 407(d)(4) of ERISA as required by section 408(e) of ERISA.

Section 4975 imposes a tax on each prohibited transaction for each year (or part thereof) in the taxable period. Sec. 4975(a). Section 4975(f)(2) defines the term "taxable period" with respect to any prohibited transaction, as the period beginning with the date on which the prohibited transaction occurs and ending on the earliest of—

(A) the date of mailing a notice of deficiency with respect to the tax imposed by section 4975(a) under section 6212,

(B) the date on which the tax imposed by section 4975(a) is assessed, or

(C) the date on which correction of the prohibited transaction is completed.

Section 4975(f)(4) defines the term "amount involved." Section 4975(f)(5) defines the term "correction."

Respondent determined the amount involved for purposes of section 4975 by considering the subject lease transactions to be separate prohibited transactions as of the day the transaction occurs and continuing on the first day of each taxable year within the taxable period as defined in section 4975(f)(2). Petitioners assert that the amount involved is the amount of $108,660, the amount of aggregate rental payments constituting prohibited transactions. Petitioners maintain that the "pyramiding method" used by respondent to determine the amount involved is not consistent with section 4975(f)(4) and that any regulations to the contrary are invalid.[9]

The legislative history indicates the calculation of the amount involved pursuant to section 4975 should parallel the self-dealing provisions of section 4941(e) concerning private foundations. H. Rept. 93-1280 (Conf.) (1974), 1974-3

[9]The pyramiding of rental payments by respondent results in the calculation of the amount involved to be $368,910 in contrast to the aggregate rental payments of $108,660.

C.B. 415, 482. Respondent issued a temporary regulation such that section 53.4941(e)-1, Foundation Excise Tax Regs., will be controlling to the extent such regulations describe terms appearing in section 4941(e) and section 4975(f). Sec. 141.4975-13, Temp. Excise Tax Regs., 41 Fed. Reg. 32890 (Aug. 6, 1976). Respondent's regulation concerning self-dealing in the private foundation context indicates that a leasing transaction will generally be treated as giving rise to an act of self-dealing on the date the transaction occurs plus an act of self-dealing on the first day of each taxable year or portion of a taxable year which is within the taxable period and which begins after the taxable year in which the transaction occurs. Sec. 53.4941(e)-1(e)(1)(i), Foundation Excise Tax Regs. The continuing use of the assets imbued with an act of self-dealing is the relevant consideration to impose a tax on any act of self-dealing. See *Adams v. Commissioner*, 70 T.C. 373 (1978), modified 72 T.C. 81 (1979), affd. without published opinion 688 F.2d 815 (2d Cir. 1982); *Rockefeller v. United States*, 572 F. Supp. 9 (E.D. Ark. 1982), affd. 718 F.2d 290 (8th Cir. 1983), cert. denied 466 U.S. 962 (1984). Respondent's regulation recognizes the continuing incidence of the act of self-dealing concerning the leasing of property or, as applicable here, the continuing incidence of the prohibited transaction concerning the subject lease transactions. Our opinion in *Durbin Paper Stock Co. v. Commissioner*, 80 T.C. 252, 256-257 (1983), sets forth the standards to examine the validity of respondent's regulations. We are satisfied that the pertinent regulations embody a reasonable statutory interpretation which harmonizes with the language of the statute, its origins, and its purpose. *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982); *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 477 (1979).

The subject lease transactions were corrected within the meaning of section 4975(f)(5) on May 10, 1982. We conclude that respondent's determination that a tax imposed under section 4975(a) on the prohibited transactions from the date the subject lease transactions occurred, plus an additional prohibited transaction on the first day of each taxable year

or portion of a taxable year within the taxable period until corrected on May 10, 1982, was proper.

Based on our determinations herein,

*Decision will be entered for the respondent.*

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect at decedent's date of death.